See also, D.C., 431 F.Supp. 566, 421 F.Supp. 740, 413 F.Supp. 189.

J. B. TAYLOR and George Bennett et al., Plaintiffs,

v.

E. P. PERINI, Superintendent, Marion Correctional Institution, Defendant.

Civ. No. C69–275.

United States District Court, N. D. Ohio, W. D.

Dec. 5, 1977.

Niki Z. Schwartz, Cleveland, Ohio, for plaintiffs.

William J. Brown, Atty. Gen., Columbus, Ohio, for defendant.

## MEMORANDUM AND ORDER

DON J. YOUNG, District Judge.

This action came to be heard upon the Fourth Report of the Special Master on the Defendants' State of Compliance with the Court's order of September 12, 1972. The parties have filed responses making no objections to the report, although the defendants have requested leave to reserve the right to make objections to the report at a future time. The Court being fully advised in the premises, it is ordered that the report is in all respects confirmed. Said report is attached hereto as Appendix A, incorporated herein by reference, and made a part hereof as fully for all intents and purposes

as if set forth at length herein. The Court further finds and orders as follows:

(1) The Fourth Report on the Defendants' State of Compliance makes it clear that the Department's Administrative Regulation 5120–9–19 fails to conform in certain important respects with the requirements imposed upon the defendants by paragraph 4 of the Court's order of September 12, 1972. The objectionable features of the Administrative Regulation were pointed out by the Special Master in his third report. *Taylor v. Perini,* 431 F.Supp. 566, 578–579 (N.D.Ohio 1977). It is equally clear that the Departmental Publications Screening Committee, in including certain publications on its "not to be permitted" list, has failed to abide by the provisions of Administrative Regulation 5120–9–19 establishing criteria which have been approved by the Court for the exclusion of printed materials from the prison.

The defendants are therefore EN-JOINED FROM:

(1) Applying to Marion Correctional Institution any portion of Administrative Regulation 5120–9–19 which is inconsistent with paragraph 4 of the Court's order of September 12, 1972, and

(2) Relying upon the "not to be permitted" list prepared by the Department's Publications Screening Committee in determining the admissibility of printed material received by inmates at Marion Correctional Institution.

(2) The Court is gratified to learn that the defendants have employed Personnel Decisions Research Institute to conduct a longitudinal empirical validation study of the Marion Correctional Office Psychological Inventory (M.C.O.P.I.) developed for use at Marion Correctional Institution. One effect of successful validation at other institutions will be to enhance the reliability of the results of the M.C.O.P.I. at Marion Correctional Institution. Thus the longitudinal empirical validation study is related directly to compliance with paragraph 10(d) of the Court's order of September 12, 1972. It is clear that the validity study requires that applicants at correctional institutions other than Marion Correctional Institution be required to take the M.C.O.P.I. and that the results of these tests not be utilized for the purpose of selecting applicants for employment. It is obvious as well that there is no basis at the present time to assume the validity of the M.C.O.P.I. for use in selecting correctional officers at any institution other than Marion Correctional Institution where it was developed.

The defendants are therefore EN-JOINED FROM:

(1) Seeking to obtain from Personnel Decisions Research Institute or from any other source during the course of the longitudinal empirical validation study any score earned on the M.C.O.P.I. by an applicant for employment at any correctional institution other than Marion Correctional Institution, and

(2) Relying in any way upon a score earned on the M.C.O.P.I. for making a determination concerning employment at any correctional institution other than Marion Correctional Institution until such time as the longitudinal empirical validation study has been completed.

(3) The plaintiffs have requested the Court to direct the Special Master to explore the feasibility of modification of Administrative Regulation 826 so as to permit inmates to possess and use recording devices within the prison. Former Administrative Regulation 826, to which plaintiffs refer, is now designated Administrative Regulation 5120–9–32. The request of the plaintiffs is hereby granted.

(4) The defendants have requested leave to make formal and specific objections to the Special Master's fourth report at a future time. The request of the defendants for leave until further order within which to file objections is hereby granted.

*IT IS SO ORDERED.*

APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| J. B. TAYLOR & GEORGE BENNETT, et al. <br><br> Plaintiffs, <br><br> v. <br><br> E. P. PERINI, Superintendent, Marion Correctional Institution <br><br> Defendant | CIVIL NO. C69–275 |

FOURTH REPORT OF THE SPECIAL MASTER
ON THE DEFENDANTS'
STATE OF COMPLIANCE

Submitted by Vincent M. Nathan,* Special Master.

## INTRODUCTION

This report is the fourth submitted by the Special Master in this case.[1] It describes the defendants' state of compliance as of November 14, 1977.

Approximately eight months have passed since the Court's adoption of the Special Master's third report. During this period, Superintendent Perini and his staff as well as Director George Denton and his staff have continued to cooperate with the Special Master in the development and implementation of plans of compliance. As a result, substantial progress has been made in many areas.

During the period covered by this report the Special Master has received assistance from Mr. Fraser McAlpine, a third year law

---

* Professor of Law, The University of Toledo.

1. Earlier reports may be found in *Taylor v. Perini,* 413 F.Supp. 189, 198 (N.D.Ohio 1976), *Taylor v. Perini,* 421 F.Supp. 740, 742 (N.D. Ohio 1976), and *Taylor v. Perini,* 431 F.Supp. 566, 570 (N.D.Ohio 1977). The original order to which these reports relate may be found in *Taylor v. Perini,* 413 F.Supp. 189, 194 (N.D. Ohio 1976).

student at The University of Toledo. Mr. McAlpine participated in every phase of the development and implementation of the plans described in this report, assisted in the task of monitoring compliance plans already effected, and contributed directly to the preparation of this document.

The report which follows begins with an analysis of the new inmate grievance procedure and the inmate councils which are the major mechanisms which have been developed in order to bring about compliance with the prohibitory paragraphs of the Court's order of September 12, 1972. It then proceeds to a discussion of the defendants' state of compliance with the provisions of the several mandatory paragraphs of that order. The report concludes with a description of the posture of this litigation as perceived by the Special Master on the basis of nearly two years of involvement with *Taylor v. Perini.*

## THE GRIEVANCE PROCEDURE

On December 26, 1976, the Department of Rehabilitation and Correction issued Administrative Regulations 5120–9–29, 5120–9–30, and 5120–9–31, thereby instituting a new inmate grievance system in all of Ohio's adult correctional institutions. *Taylor v. Perini*, 431 F.Supp. 566, 571 (N.D.Ohio 1977). Between January 1, 1977 and August 31, 1977, a total of 1,582 grievances were processed by the eight Inspectors of Institutional Services who serve as institutional grievance officers under the new system.

Less than one month after the implementation of the new grievance procedure, the Director of the Department of Rehabilitation and Correction appointed a Special Monitoring Committee to study and evaluate the revised inmate grievance system throughout the state and to recommend any modifications which would accomplish the objectives of effectiveness, independence and feasibility. That Committee commenced its study in February, 1977, and issued its report in July, 1977.

The portion of this report which follows begins by describing the incidence of use of the new system by inmates during the eight months prior to September 1, 1977. Within that general framework an effort is made to describe the new process as it has operated at Marion Correctional Institution. Finally, the recommendations of the Special Committee to Monitor the Inmate Grievance Committee are set forth, together with a statement of the response of the Department of Rehabilitation and Correction to each of those recommendations.

The following chart indicates that approximately 36% of all grievances filed under the new system between January 1, 1977 and August 31, 1977 arose at Marion Correctional Institution.

Chart 1

| Institution | Number of Grievances Filed 1/1/77 – 8/31/77 | |
| --- | --- | --- |
| Chillicothe Correctional Institution | (CCI) | 217 |
| Correctional Medical & Reception Center | (CMRC) | 118 |
| Lebanon Correctional Institution | (LCI) | 258 |
| London Correctional Institution | (LoCI) | 25 |
| Marion Correctional Institution | (MCI) | 567 |
| Ohio Reformatory for Women | (ORW) | 113 |
| Ohio State Reformatory | (OSR) | 132 |
| Southern Ohio Correctional Facility | (SOFC) | 152 |
| Total | | 1,582 |

Under procedures established by the Chief Inspector, all grievances are evaluat-ed according to 22 areas of concern. The following chart summarizes the number of grievances in each of these categories:

Chart 2

| Area of Concern [2] | CCI | CMRC | LCI | LoCI | MCI | ORW | OSR | SOCF | Total |
|---|---|---|---|---|---|---|---|---|---|
| Conditions | 13 | 8 | 1 | 0 | 9 | 0 | 5 | 3 | 39 |
| Extortion | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Harassment | 6 | 15 | 16 | 0 | 27 | 3 | 18 | 6 | 91 |
| Inappropriate Supervision | 4 | 2 | 33 | 0 | 51 | 0 | 11 | 0 | 101 |
| Inmate Accounts | 10 | 3 | 3 | 6 | 38 | 1 | 3 | 12 | 76 |
| Legal | 14 | 1 | 2 | 0 | 22 | 0 | 0 | 13 | 52 |
| Mail | 23 | 5 | 16 | 11 | 48 | 3 | 3 | 11 | 120 |
| Medical | 45 | 17 | 5 | 2 | 73 | 22 | 8 | 31 | 203 |
| Parole | 4 | 4 | 1 | 0 | 8 | 0 | 1 | 1 | 19 |
| Placement | 25 | 0 | 4 | 0 | 72 | 1 | 6 | 3 | 111 |
| Institutional Policy | 26 | 0 | 20 | 2 | 34 | 0 | 27 | 11 | 120 |
| Departmental Policy | 12 | 0 | 0 | 0 | 1 | 0 | 3 | 2 | 18 |
| Program | 4 | 2 | 2 | 0 | 5 | 1 | 0 | 3 | 17 |
| Property | 5 | 52 | 37 | 2 | 103 | 18 | 39 | 21 | 277 |
| Protection | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 2 | 5 |
| Racial | 0 | 0 | 1 | 0 | 5 | 0 | 2 | 1 | 9 |
| Rules Infraction Board | 8 | 0 | 77 | 1 | 19 | 3 | 0 | 11 | 119 |
| Staff | 9 | 6 | 20 | 0 | 0 | 53 | 2 | 7 | 97 |
| Threats | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 1 | 7 |
| Visits | 5 | 1 | 8 | 1 | 27 | 1 | 2 | 8 | 53 |
| Other | 4 | 0 | 10 | 0 | 11 | 5 | 0 | 5 | 35 |
| Use of Force Without Reports | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 217 | 118 | 258 | 25 | 555 [3] | 113 | 132 | 152 | 1,570 [3] |

2. These areas of concern are not mutually exclusive. The line between harassment and inappropriate supervision, for example, is a fine one. In addition, grievances in either of these categories may have racial overtones. The task of reporting grievances by area of concern is that of the Inspector at each institution. One wonders if all Inspectors are utilizing the categories in the same way. In particular, the "Staff" category may include some grievances which involve allegation of harassment or inappropriate supervision.

3. The total number of grievances shown for Marion Correctional Institution is 12 less than the total number shown to have been filed at that institution on Chart 1, p. 4, supra. Twelve grievances were "under investigation" at the time of the Chief Inspector's report for August, 1977, from which some of the data in Chart 2 are drawn. This is reflected in the total number of grievances shown in Chart 2 (1,570) as compared to the total reflected in Chart 1 (1,582).

Chart 3 summarizes the percentage of all grievances, by area of concern, which arose at Marion Correctional Institution from January 1 through August 31, 1977:

Chart 3

| Area of Concern | % of Total Grievances Arising at M.C.I. |
|---|---|
| Conditions | 25.7 |
| Extortion | No grievances in any institution |
| Harassment | 29.6 |
| Inappropriate Supervision | 50.4 |
| Inmate Accounts | 50.0 |
| Legal | 42.3 |
| Mail | 40.0 |
| Medical | 35.9 |
| Parole | 42.1 |
| Placement | 64.8 |
| Institutional Policy | 28.3 |
| Departmental Policy | 5.5 |
| Program | 29.4 |
| Property | 37.1 |
| Racial | 55.5 |
| Protection | 0.0 |
| Rules Infraction Board | 15.9 |
| Staff | 0.0 |
| Threats | 28.5 |
| Visits | 50.9 |
| Other | 31.4 |
| Use of Force Without Reports | 0.0 |

During this time the average daily population at Marion Correctional Institution was approximately 10% of the total population of Ohio's eight adult correctional institutions. Thus it is apparent that in many categories, M.C.I. produced a disproportionate number of grievances. One explanation for this phenomenon could be that M.C.I. is a remarkably worse institution than others in the system. The Special Master has spent almost two years working closely with staff and inmates at Marion and has toured thoroughly the other seven institutions, meeting both the Superintendent and ranking staff in those facilities. In the judgment of the Special Master, the exceptionally high rate of filing of grievances by inmates at M.C.I. cannot be explained on the basis of differential conditions at M.C.I. as compared to the other seven institutions. This judgment is confirmed by that of a number of M.C.I. inmates who have been incarcerated at other Ohio institutions as well and who agree that M.C.I. is by no means the worst of the lot.

A better explanation for the disproportionate use of the grievance mechanism by M.C.I. inmates can be found in the observation contained in a recent publication on grievance mechanisms in correctional systems throughout the United States:

One of the most difficult problems associated with the creation of an effective design for any grievance mechanism is the establishment of credibility.[4]

A study described in that report substantiates the thesis that the greater the credibility of a grievance mechanism, the more likely it is that inmates will make use of the system.[5] The new Ohio grievance system in operation since January, 1977, depended to a very large extent upon the personality of the individuals serving as Inspectors of Institutional Services as well as that of the Chief Inspector. Missing from the system

4. J. Keating, V. McArthur, M. Lewis, K. Sebelius, & L. Singer, *Grievance Mechanisms in Correctional Institutions* 13 (1975).

5. *Id.* at 9.

 were certain elements which would tend to increase the belief of inmates that the mechanism would operate fairly and effectively. Chief among these were outside review of individual grievance resolutions and outside monitoring of grievance results in general.[6]

While these systemic limitations operated more or less equally at all of Ohio's correctional institutions, it is clear that the effectiveness of the eight Inspectors of Institutional Services varied considerably. The Special Committee to Monitor the Inmate Grievance System, whose report is discussed at pages 1193–1197 *infra*, made the following observation about the Inspectors whom they interviewed in depth:

> However, we met some whose capacities are obviously taxed by the minimum burdens of the job and whose performance could not be characterized as fully acceptable.[7]

The Special Master has met and talked with almost all of the Inspectors of Institutional Services and his observations confirm the findings of the Special Committee.

Several factors coincide to explain the higher degree of inmate confidence in the grievance mechanism as it operated at M.C.I. and thus the higher incidence of use of the system by those inmates. In the first place, the Inspector of Institutional Services at M.C.I. has made a substantial effort to make the grievance system work. Intimately acquainted as he is with the history of *Taylor v. Perini,* he understands the relationship between the development of a successful grievance mechanism and the termination of this litigation. Second, and of at least equal importance, the presence of the Special Master on the scene in Marion and his assurances to inmates that Marion grievances were being monitored by him would explain the inmates' greater willingness to resort to the system. In addition, the two inmate councils at M.C.I. have been instructed repeatedly by the Special Master to refer inmates with complaints to the Inspector of Institutional Services. Members of both councils have made it clear to the Special Master that they have done this. Finally, the Special Master informed M.C.I. inmates (through the inmate council) of the appointment of the Special Committee to review the inmate grievance system. As a result, M.C.I. inmates probably were more aware of that Committee's activities than were inmates at other institutions.

Thus it is the conclusion of the Special Master that the high incidence of use of the grievance system by M.C.I. inmates reflects the fact that those inmates had greater confidence that their complaints would be resolved by the mechanism. As will be shown subsequently, however, this confidence was not justified in all instances.

The data in Charts 1, 2, and 3 *supra* make it clear that a substantial number of complaints continue to be made in areas directly related to the prohibitory paragraphs of the Court's order in this case. Eighty-three grievances were filed in the areas of harass-

---

6. *Id.* at 33. It is true that the Special Committee to Monitor the Inmate Grievance System was in operation from early January through June, 1977. The Committee visited no institution more than twice and had a generally low level of visibility among inmates. The Committee was charged by the Director of the Department and the Special Master in the following terms: "Your function is not to resolve grievances and you should not attempt to act as a substitute for or an addition to the grievance and disciplinary procedures now in effect."

*Taylor v. Perini,* 431 F.Supp. 566, 614 (N.D. Ohio 1977). Thus the Special Committee performed no function with respect to outside review of individual grievances, and its policing role as an outside monitoring agency appeared to be very limited.

7. Special Committee to Monitor the Inmate Grievance System, *Report to the Director, Department of Rehabilitation and Correction and the Special Master, Taylor v. Perini,* pp. 1219–1220 *infra.*

ment, inappropriate supervision, and race.[8] In addition, a substantial number of grievances were filed in areas which are unrelated to *Taylor* but which have obvious constitutional implications (for example, 73 grievances in the area of medical care). These data reinforce the conclusion of the Special Master that the development of an effective grievance system is essential in order to avoid the continuation or recurrence of practices which led to this litigation as well as the development or continuation of others which in all likelihood would lead to similar litigation.

The Special Master has in fact reviewed the entire mass of grievances dealt with by the Inspector of Institutional Services at M.C.I. from January through October, 1977. It is clear to the Special Master that the Inspector has made a substantial and good faith effort to fulfill his obligations under the Department's Administrative Regulations establishing the grievance mechanism. Those efforts have been successful to the point that the unequivocal finding of the Special Master in his first report to the Court is no longer true:

> There is no effective grievance procedure maintained to process complaints relating to racial discrimination, harassment, intimidation, or insult. *Taylor v. Perini,* 413 F.Supp. 189, 267 (N.D.Ohio 1976).

At the same time, the Special Master's review of the voluminous records produced by M.C.I. has convinced him that the operation of the present system is not sufficient to accomplish the purposes of the Court's order in this case. In reaching this conclusion, the Special Master is but applying to a single institution the general observation made by the Special Committee to Monitor the Inmate Grievance System about the system as a whole.

In general the Inspector has been successful in resolving day-to-day complaints concerning misdelivery of mail, the inability of inmates to obtain proper clothing from the quartermaster, and requests of inmates for free replacement of broken eyeglasses. By utilizing appropriate staff, he has been able to resolve a number of questions concerning inmates' financial accounts and institutional records. In cases in which the institution has been in error, the Inspector has apologized or has obtained an apology from a staff member. At no point, however, has the Inspector recommended any change of basic institutional or departmental policy in spite of the recurrence of complaints in a particular area.

For example, 103 grievances concerning property were filed between January 1 and August 31, 1977. This constituted more than 18% of the grievances responded to by the Inspector during this period. The majority of these alleged theft, loss, or destruction of inmates' property by other inmates or by members of the staff. In virtually no such case was the Inspector able to assist the inmate in any way other than by providing him with forms needed to file a claim before the Court of Claims. No suggestions have been made with respect to increasing security or the taking of any other steps which might render inmates' property more secure. Likewise, although 73 grievances relating to medical care were received, the Inspector has made no recommendations for change in policy or practice within the medical department. These constitute clear examples of the usefulness of the grievance system in identifying serious and recurring problems; what is needed, however, is a determined effort on the part of the Inspector to find at least a partial solution to the problem and to recommend an appropriate course of action to the Superintendent or to the Chief Inspector.

With respect to grievances directly related to the prohibitory paragraphs of the order of the court in this case, the Inspector has been less effective than he has been in resolving day-to-day problems. Allegations of harassment, inappropriate supervision, and racial discrimination have been reduced in almost every case to a test of credibility

---

8. Other areas in which *Taylor*-related grievances were reported by the Inspector include the areas "legal," "mail," and "placement."

between the charging inmate and the charged staff member. While the Inspector frequently discussed the allegation with the officer, the credibility contest was resolved in virtually all cases in favor of the staff member. In only one case was an officer reprimanded, and then only after he admitted that he had kicked an inmate in the heel who was violating dormitory rules by doing push-ups.

The Special Master recognizes that reliable evidence in cases in which the inmate alleges harassment, inappropriate supervision, and racial discrimination is difficult to obtain. One advantage of a formal grievance system, however, is that a pattern of conduct may emerge from repetitive complaints about a particular staff member. This in fact has occurred in the case of at least one officer against whom seven grievances were filed between July 29, 1977 and September 7, 1977. All alleged harassment or inappropriate supervision. Although the Inspector spoke with the officer on a number of occasions, it does not appear that any written report of these repeated allegations was ever made to the Superintendent or that a concerted investigation was launched to determine the suitability of this officer for continued employment. The Inspector did recommend that the officer attend a one-week training course at the Ohio Peace Officer Training Academy, and the officer was scheduled to attend the course on November 14 through 18.

A number of allegations of harassment have been related to various officers' conduct in writing disciplinary conduct reports against inmates. These have been uniformly dismissed by the Inspector as relating to the Rules Infraction Board process and thus being outside the scope of his jurisdiction. While it is true that Administrative Regulation 5120–9–31 provides, "A complaint relating to a specific disciplinary decision will not be considered," allegations of harassment by abuse of the power to issue disciplinary conduct reports fall within the jurisdiction of the Inspector. Indeed the last sentence of section (C) of Administrative Regulation 5120–9–31 specifies that

Such claims which present allegations which in part [are grievable] and in part [are not grievable] will be considered insofar as they are not excluded under this paragraph.

In one case an inmate filed a grievance alleging harassment and intimidation in the act of "issuing frivolous disciplinary reports." Although the grievance was heard *after* the inmate had been found not guilty by the Rules Infraction Board, the entire response of the Inspector was the following:

> This complaint revolved around a conduct report being issued against him, and according to the Administrative Regulations the Inspector is not to be involved in decisions having to do with the R.I.B. process. The decision was made by the R.I.B. panel and Inmate _ _ _ was found to be not guilty, so the process was carried through."

In spite of the fact that the grievance mechanism at M.C.I. has not accomplished all that it must in order to eliminate the practices which have led to this litigation, it is clear to the Special Master that the Inspector at Marion has attempted to make the system work effectively. He spends his entire working day acting as Inspector, meets with individual inmates on a regular and frequent basis, and makes an effort to resolve those issues which appear to him to be susceptible to resolution. Formal responses have almost always been timely. While this report has suggested certain areas in which the Inspector must develop more initiative and sensitivity in responding to inmates' complaints, it should not be taken as any indication of lack of qualification on the part of the individual who holds this position. With improved training and direction from the Chief Inspector and the development of more independent status *vis à vis* the Managing Officer, the Inspector at M.C.I., in the opinion of the Special Master, is capable of performing the duties of his position. The reforms which are needed are systemic in nature; when those reforms are made, the current Inspector at Marion will

be in a position to perform in a more effective manner.

Thus it is clear to the Special Master that the grievance system at Marion Correctional Institution, in its actual operation, is serving as a vehicle for the voicing of complaints by inmates—including those concerning areas relating to the Court's order in this case. At the same time additional efforts are required in order to make the system *responsive* to inmates who use it. In particular, the present system appears to be ineffective in dealing with allegations of harassment and inappropriate supervision.

Twenty-one appeals from inmates at M.C.I. were decided by the Chief Inspector between January and November, 1977. Of these, three resulted in a finding that the Inspector of Institutional Services was in error and the inmate was given relief by the Chief Inspector. In four cases it appears that the inmate was given partial relief. (In one of these, the grievance was "dismissed" in spite of the fact that the Chief Inspector acknowledged that "your claim was valid." The ground for the dismissal was that the procedure which led to the inmate's complaint had been corrected by an earlier order of the Chief Inspector based upon his administrative review of recent grievances.) In 14 cases, the decision of the Inspector of Institutional Services was upheld.

Several of these 14 responses by the Chief Inspector confirm the weaknesses observed above concerning the operation of the system at Marion. In one appeal relating to destruction of property during a shakedown, the Chief Inspector offered no solution other than the inmate's filing a claim with the Court of Claims. If the property was in fact destroyed during a shakedown by officers, some additional response certainly would have been appropriate. In another appeal involving an allegation of misuse of the disciplinary conduct report writing process, the Chief Inspector responded, "Had there been no basis for a ticket, the review officer would have not processed the ticket in the beginning." The

assumption that all such abuses will be rectified by the charging officer's shift commander is hardly a complete disposition of the question raised by the inmate on appeal.

In discussing the effectiveness of the grievance system at the institutional level, the Special Master indicated that while the system represented a distinct improvement over that which it replaced, substantial room for improvement existed. The same, it would appear, can be said about the operation of the system at the departmental level. The Special Master is impressed by the fact that a fair number of inmates are receiving partial or total relief at the hands of the Chief Inspector; at the same time, there appear to be a lack of initiative in dealing with certain problems and a failure to recognize the true import of certain appeals. As a result, the system is not operating with the effectiveness which was sought by those who implemented it.

The final element of this analysis of the new inmate grievance procedure relates to the recommendations of the Special Committee to Monitor the Inmate Grievance System which submitted its report to the Director of the Department of Rehabilitation and Correction and to the Special Master in July, 1977. The events leading to the appointment of this Committee are detailed in *Taylor v. Perini,* 431 F.Supp. 566, 571–572 (N.D.Ohio 1977). In its report, the Committee made a number of unanimous recommendations for improvement of the grievance system, the adoption of which will increase the credibility of the system and make it more effective. See Appendix A, p. 1217 *infra.* What follows is a brief summary of the Committee's recommendations together with the response of the Department of Rehabilitation and Correction to those recommendations.

1. *There should be a permanent external monitoring committee.* The Committee recognized that permanent external monitoring, on a continuous basis, was essential to establish the independence, and thus the credibility, of the grievance mechanism. The Committee recommended that a permanent monitoring committee of five members

be appointed by the Governor, and it established criteria for the membership and standards for the operation of such a committee. In response to this recommendation, the Department of Rehabilitation and Correction informed the Special Master of Amended House Bill Number 305 which was then pending before the General Assembly of the State of Ohio. That Bill provided for the appointment of a Correctional Institution Inspection Committee consisting of eight legislators appointed by the President Pro Tempore of the Senate and the Speaker of the House of Representatives. The Department proposed to sponsor an amendment to the legislation which would require that committee to include in its annual report a "separate evaluation of the inmate grievance procedure at each state correctional institution." At a meeting of the Director of the Department of Rehabilitation and Correction, the Chairman of the Special Committee to Monitor the Inmate Grievance System, and the Special Master, it was agreed that this legislative committee would fulfill the purpose of the monitoring committee recommended by the Special Committee. Both the Department of Rehabilitation and Correction and the Special Master spoke in favor of the Bill at a meeting of the Finance Committee of the House of Representatives. The Bill was subsequently passed by the Legislature and signed into law by the Governor. The text of the law is attached as Appendix B, p. 1223 infra.

2. *The Inspector of Institutional Services at each institution should be appointed by and be under the direct supervision of the Chief Inspector.* The Special Committee believed that this organizational change was dictated by the need "for the maintenance of the credibility of the system." The Department of Rehabilitation and Correction responded that it could not agree to this proposal because of the need for all personnel at a given institution to be appointed by and directly responsible to the Managing Officer. In addition, the Department suggested that the Inspector would be considerably less effective if he were to be regarded as an "outsider" by other staff within the institution. The Department agreed that the Inspector should be responsible both to the Managing Officer and to the Chief Inspector. Indeed, on April 5, 1977, the Director and the Chief Inspector had issued a directive to all managing officers indicating that performance evaluations on Inspectors of Institutional Services would be completed by the Chief Inspector and then be returned to the Managing Officer for signature as appointing authority. See Appendix. C, p. 1224 infra. In the opinion of the Special Master, this arrangement constitutes a reasonable response to the recommendation of the Special Committee.

3. *The Administrative Regulations should be much more specific concerning the qualifications and duties of the Chief Inspector and the Inspector of Institutional Services.* The Special Committee recommended that a number of specific criteria be incorporated into the Administrative Regulations relating to these officials. The Department agreed to all of these recommendations with two exceptions. The Special Committee recommended that the Inspector of Institutional Services "have no other assignments than those necessary for the inspection of services and the resolution of grievances." The Department agreed to amend the regulation to make it clear that the "primary function" of the Inspector would be the resolution of grievances and the inspection of services. The Special Committee recommended that the Inspector of Institutional Services conduct training of institutional staff on the operation and purpose of the grievance system and that he maintain a roster of staff members receiving training. The Department suggested only the elimination of the duty to maintain a roster based upon the fact that such a roster is maintained by the training officer in each institution.

While the Special Master has no difficulty with the maintenance of a training roster by the institutional training officer, he is concerned about the Department's re-

sponse with respect to the duties of the Inspectors. The Department has argued that the modest incidence of use of the grievance system at some institutions suggests that the position does not require the full-time attention of the Inspector. In the opinion of the Special Master, however, the low utilization rate indicates only that the Inspector should be doing more than he is at each of those institutions to make the grievance system operate effectively. Nonetheless, *so long as the position of Inspector remains full-time at Marion Correctional Institution,* as it has been since January, 1977, the Special Master does not believe that he has the authority to object to the Department's position as it relates to other institutions. If the Department is truly interested in developing an effective grievance mechanism at all of its adult institutions, however, it should inquire into the reasons for the low level of grievance activity at certain of its institutions rather than insist that additional unrelated responsibilities be assigned to the Inspectors at those institutions.

4. *The terminology of "formal" and "informal" grievances should be discarded as confusing and unspecific.* For the reasons suggested in the Special Committee's recommendation, the Department of Rehabilitation and Correction agreed to discard the distinction between "formal" and "informal" grievances.

5. *Inspectors should be encouraged to engage in regular consultation with inmate groups.* The Department of Rehabilitation and Correction agreed to implement this recommendation by inserting language to this effect in the amended version of the Administrative Regulation detailing the duties of the Inspector of Institutional Services.

6. *The Chief Inspector should review the draft of all proposed Administrative Regulations in advance to determine the probable impact of the regulation in creating grievances.* The Department of Rehabilitation and Correction agreed to implement this recommendation.

7. *The role of the Managing Officer with respect to the Inspector of Institutional Services should be limited to information and advice and Managing Officers should not assume the role of "Super-Inspector".* The substance of this recommendation is that the Managing Officer, to the extent that he resolves informal complaints by various means, should keep the Inspector of Institutional Services informed. In addition, investigations of serious complaints, brought to the attention of the Managing Officer, should be delegated to the Inspector. Finally, the Inspector should be totally independent, consistent with the institution's need for security, to investigate and resolve grievances. He should not be regarded as a mere assistant to the Managing Officer. Although the Special Committee did not recommend any particular action to implement this recommendation, the Department of Rehabilitation and Correction agreed with the recommendation in principle. To the extent possible, this attitude will be reflected in the revised Administrative Regulations and in the operation of the Chief Inspector's office *vis à vis* managing officers.

8. *Inspectors should demonstrate increased initiative in the conduct of general inspections as opposed to resolution of grievances.* Administrative Regulation 5120–9–29(a) provides that the Inspector "shall also monitor the application of institutional and departmental regulations affecting the services and security of the institution." These duties are in addition to his responsibilities as the grievance resolution agent within the institution. The Department of Rehabilitation and Correction agreed to emphasize this facet of the Inspector's responsibilities. As a beginning, the Chief Inspector has ordered each Inspector to submit a report each month on the operation of one departmental policy within the institution.

9. *Independent reviewers should be appointed to assist in the settlement of grievances.* As part of its recommendation that a permanent external monitoring committee be established, the Special Committee

 made it clear that the functions of system monitoring and grievance review are altogether different in nature. The Special Committee recommended that its proposed monitoring committee nominate independent reviewers to advise the Director in those cases in which the inmate grievant is dissatisfied with the result of the grievance process and in those cases in which the Director wishes to obtain outside views before affirming a decision of the Chief Inspector favoring the inmate. As an alternative, the Chairman of the Special Committee suggested the use of outside reviewers who would make advisory recommendations to the Chief Inspector.

After discussion with the Special Master, the Department of Rehabilitation and Correction agreed to initiate an "experimental" program at Marion Correctional Institution, utilizing members of the institution's Citizens' Advisory Committee to serve as outside reviewers. Any inmate dissatisfied with the decision rendered by the Inspector of Institutional Services will be permitted to seek outside review. A single member or a panel of the Citizens' Advisory Committee will be assigned to cases on a rotating basis. An outside reviewer will be permitted to reach his decision on the basis of the written record, to order an investigation and a written report of its results, or to hold a hearing within the institution in order to hear evidence. At the conclusion of his study, the reviewer will submit a written advisory opinion to the Chief Inspector, a copy of which will be sent to the inmate/grievant. In no case will the opinion of the reviewer be binding upon the Chief Inspector or the Director. After the Chief Inspector has determined the action which he believes to be appropriate, his recommendation as well as the advisory opinion of the outside reviewer will be forwarded to the Director for final action.

The Special Master is appreciative of the willingness of the Department to implement this experimental program at Marion.

Before outside review can commence, however, it will be necessary to develop review procedures and to train the members of the Citizens' Advisory Committee to serve as reviewers. For these purposes, the Special Master recommends that the Center for Community Justice, an agency with substantial expertise in this area, be employed to conduct a training program in Marion. The training effort should be directed at the members of the Citizens' Advisory Committee, the eight institutional Inspectors, and the Chief Inspector simultaneously. Approximately three months after the process of outside review begins, it is the recommendation of the Special Master that a review be conducted of the program's effectiveness.

The Special Master has indicated strongly his agreement with the principle enunciated by the authors of Grievance Mechanisms in Correctional Institutions:

> The mechanism must include some form of independent review, i. e., review by people outside the correctional structure. The more totally independent of official governmental control such review is, the more likely it will be to promote inmates' belief in the mechanism's fairness and their willingness to use it.[9]

It should be stressed that the element of outside monitoring which will be provided by the legislative committee established by recent legislation is altogether different from that of outside review of individual grievances which will be provided by the Citizens' Advisory Committee. Like the Special Committee to Monitor the Inmate Grievance System, the Special Master believes that both elements are essential for the maintenance of an effective fair, and credible system. Thus any final conclusions with respect to the effectiveness of the grievance mechanism must await the evidence which will be produced by the use of outside reviewers at Marion Correctional Institution over the next months.

9. J. Keating, V. McArthur, M. Lewis, K. Sebelius, L. Singer, Grievance Mechanisms in Correctional Institutions 33 (1975).

## THE INMATE COUNCILS

In addition to the development of an effective grievance mechanism, compliance with the prohibitory paragraphs of the Court's order in this case requires the establishment of a permanent and effective inmate council in the stockade and in the honor dormitory at M.C.I. The purpose of these councils is to provide a means for bringing problems to the attention of the administration in order that those problems may be alleviated by administrative action. Like the grievance system, ongoing inmate councils will serve to promote compliance with all of the provisions of the Court's order as well as to avoid practices and procedures which could lead to similar litigation.

In his third report, the Special Master was able to report some progress on the part of the first councils which were elected on August 6, 1976; indeed, at the time of the election of the second councils on February 5, 1977, there appeared to be a high degree of interest in these organizations on the part of inmate population. The Special Master made it clear that the strengthening of the councils was a matter of highest priority:

> With the continuation of a good faith effort by the prison's administration to cooperate with the councils and to strengthen them, these organizations may take root in the institution. Above and beyond all other compliance efforts, Superintendent Perini and his staff must recognize that this will be the chief contribution of the institution itself to the termination of this litigation and the prevention of future suits like *Taylor v. Perini. Taylor v. Perini,* 431 F.Supp. 566 (N.D.Ohio 1977).

It is thus with great regret that the Special Master must report that both inmate councils—and particularly the stockade council—have experienced substantial difficulty since the most recent report of the Special Master. The result, which could surprise no one, is that inmate interest in the organizations has fallen off to a remarkable extent. Inmate apathy was apparent at the time of the election of the third councils on August 5, 1977, and the third stockade council has experienced significant difficulties in retaining membership and accomplishing the basic tasks of organization.

For many months the Special Master has emphasized that both councils would require the dedicated assistance of staff liaison. This responsibility was assigned by the Superintendent to two high ranking staff members. Their task was to assist the councils in the development of viable proposals to remedy existing problems as well as in the marshalling of resources to implement these proposals upon their acceptance by the Superintendent. The guidance and assistance of these liaison staff members were essential for the development of proposals acceptable to the Superintendent.

With respect to the stockade council, the liaison staff member has adopted an essentially passive role. He has been willing to assist the council in some ways when it has sought his help, but he has not provided the element of positive guidance which is needed. The problem was compounded by the fact that the Superintendent met infrequently with the council or its executive committee. As a result, the organization simply drifted.

In many instances, proposals made by the council were met with negative response; in others, no formal response was ever given; in still others, the administration agreed to the proposal put forward by the council but failed to implement the needed changes. The inmates thus have learned that agreement alone does not accomplish change, and their distrust of the system has been increased by the failure of the administration to implement a number of solutions upon which agreement was reached. These delays and failures in implementation have created in some instances a higher level of frustration among inmates than did the problem which gave rise to the council proposal in the first instance.

The Special Master has not received regular written reports from the liaison staff member concerning the activities of the stockade council. Thus the following statement of council proposals and administrative responses has been drawn from the records and minutes of the stockade council itself.

Chart 4

| Substance of Proposal | Date of Proposal | Response by the Administration |
|---|---|---|
| 1. The council requested that a new system be established for the distribution of sheets and pillow cases to remedy shortages in the institution. | 12-9-76 | On 12-17-76, the Superintendent responded formally and positively to the council's request. The new system is operational and is working effectively. |
| 2. The council proposed that the audio system in the gymnasium used for showing movies be repaired or replaced. | 12-9-76 | On 3-2-77 and 6-29-77 the council was assured that a new audio system would be installed by 11-77. The sound system has not yet been ordered. |
| 3. The council indicated the need for improved procedures designed to insure the delivery of Christmas packages without inordinate delay. | 12-9-76 | The administration assigned additional personnel to assist with the delivery of Christmas packages, and such packages were delivered with a minimum of complaints. |
| 4. The council requested that the administration provide better service in the cafeteria for inmates with dietary problems. | 1-77 | Although the administration did assign responsibility for improving the diet line to the institutional physician, no progress has been reported. |
| 5. The council requested the administration to install a microwave oven in the visiting room for use by visitors. | 1-77 | The administration refused to provide such an oven, but did agree to allow a microwave oven if it was purchased by an inmate organization. |
| 6. The council requested permission for visitors to bring cameras into the visiting room for taking family photographs. | 1-77 | The institution refused to allow visitors to bring in cameras. The Jaycees would continue to be responsible for photographs, although this procedure has proven to be ineffective. |
| 7. The council proposed that a sink be installed in the masonry school area. | 3-77 | On 4-4-77, the Director of the Education Department responded that the need for a sink in that area was being examined. No formal response has been given to the council. |
| 8. The council requested the designation of a cellblock for use by inmates participating in the college program. | 3-22-77 | This proposal was refused on 3-28-77. |

| Substance of Proposal | Date of Proposal | Response by the Administration |
|---|---|---|
| 9. The council requested the designation of another quiet dormitory. | 3-22-77 | On 3-28-77, the council was instructed that they must establish a greater showing of need for another quiet dormitory. |
| 10. The council proposed the creation of a vocational education program for food service training. | 3-22-77 | The administration indicated on 3-28-77 that this was a possibility and would be examined. No final response has been submitted to council. |
| 11. The council requested the provision of towels larger than the hand towels presently issued. | 3-22-77 | The administration stated that larger towels were not available for distribution. |
| 12. The council requested that inmates be allowed to acquire postage through the cash slip system since stamps were no longer allowed. | 3-22-77 | The administration agreed to this proposal and the procedure has been adopted and has been working effectively by 5-77. However, the cash slip system is restricted to legal mail, excess postage, and cards. |
| 13. The council proposed a revision of the good conduct visit policy to allow inmates to accumulate good conduct visits so they could be used more conveniently and to allow persons not on the institutional visiting list to visit during a good conduct visit. | 5-6-77 | The administration refused to permit either the accumulation of good conduct visits or visits by persons not on the visiting list during such visits. |
| 14. The council requested that the administration provide coloring books for small children in the visiting room. | 5-6-77 | The council had not received a formal response to this proposal. |
| 15. The council proposed that fans be provided for the visiting room for the summer months. | 5-6-77 | The council has not received a formal response to this proposal. |
| 16. The council requested that the administration acquire facilities to allow inmates to make a monthly phone call. | 5-6-77 | This was not a council project initially, but once the plan became known, the council adopted it as a council project. Negotiations with the telephone company are still in progress. |

| Substance of Proposal | Date of Proposal | Response by the Administration |
|---|---|---|
| 17. It was requested that representatives from council be allowed to participate in the orientation program for incoming inmates. | 5-6-77 | This proposal was approved on 7-19-77, and council representatives have been allocated 30 minutes to address incoming inmates on a weekly basis. |
| 18. The council requested that all rule and policy changes be posted in advance to put inmates on prior notice. | 5-6-77 | The council has not received a formal response to this proposal. |
| 19. The council proposed that inmate's visiting files be kept confidential. | 5-6-77 | The council has not received a formal response to this proposal. |
| 20. The council requested that new arrivals at M.C.I. be given a $5 line of credit to make purchases from the commissary before their funds are transferred from their former institution. | 5-6-77 | No final response has been submitted to council. |
| 21. The council indicated the need to provide more adequate cleaning of cell-block and dormitory refuse cans. | 10-4-77 | On 10-4-77, the Superintendent assured the council that he would investigate the problem. No final response has been received by council. |

Thus in some eleven months, 21 council proposals have resulted in six positive and six negative responses. Two matters upon which the council and the administration are in agreement—the installation of telephones and a new movie sound system—have dragged on for months without any demonstrable progress. Nine proposals have not been graced with a formal written response of any kind from the administration.

Given such a record, it is hardly astonishing that the council has lost the confidence of much of the inmate population and is suffering from a degree of internal dissension. Indeed the fact that the council has survived at all is something of a tribute to the willingness of some inmates at least to continue to seek to improve their situation through orderly and legitimate channels.

The inmate council in the honor dormitory has proven to be somewhat more effective than that in the stockade. Staff liaison with that group has been more effective and many of the proposals made by the council were of such a nature that they could be agreed to and implemented by the liaison staff member. The following chart indicates the nature and date of formal proposals which have been submitted by the honor dormitory council together with a statement of the administration's response.

Chart 5

| Substance of Proposal | Date of Proposal | Administrative Response |
|---|---|---|
| 1. A request was made for repair of the deep fryer and exhaust fans in the cafeteria. | 9-16-76 | On 12-17-76, the administration agreed to repair these facilities as soon as possible. After evaluation of this equipment, the fans were found to be operating and the fryer was beyond repair. |
| 2. A request was made for the addition of pastries to the commissary list. | 9-16-76 | As of 6-7-77. baked goods were available in the commissary, but once these items were available, inmates were no longer able to take bread from the dining room. |
| 3. A request was made for a revised cafeteria schedule and distribution of planning menus. | 9-17-76 | The evening cafeteria remains the same. The menus requested were the master planning menus, and the administration felt that because the menus were not binding they need not be distributed. |
| 4. A request was made to alter the work schedule of men assigned to the cafeteria and to attempt to alleviate the shortage of help in that area. | 9-16-76 | On 12-17-76, the administration agreed that incoming inmates would be assigned to the cafeteria to solve the problems in that area. The council reported on 8-9-77 that this situation had greatly improved. |
| 5. A request was made for the enlargement of the visiting room. | 10-3-76 | On 12-17-76, the administration agreed to examine this proposal and submit a report by 1-1-77. Because of excessive cost, this proposal was refused. |
| 6. The council proposed that the men's and women's restrooms adjacent to the visiting room be enlarged. | 10-3-76 | Although no action was taken to enlarge the men's restroom, a second women's bathroom has been constructed and made available. |
| 7. A request was made for the enlargement of the outdoor visiting area and to provide improved accommodations in that area. | 10-3-76 | The institution promised to give a final answer by 3-1-77. A plan was submitted on 6-2-77 that denied the proposal to enlarge the area, but the accommodations were improved in June, 1977. |
| 8. A request was made for one-time visits by persons not on the visiting list. | 10-3-76 | This proposal was refused on 11-30-76. |
| 9. The council requested that inmates be allowed to wear either blue or green institutional clothing on visiting days. | 10-3-76 | This proposal was refused on 11-30-76. |

| Substance of Proposal | Date of Proposal | Administrative Response |
|---|---|---|
| 10. The council requested that inmates be allowed to bring food into the institution from the visiting room. | 10-3-76 | Although this request was turned down on 11-30-76, the Superintendent created an exception for the forthcoming Christmas holidays. |
| 11. The council indicated the need for a trained food service supervisor for the cafeteria. | 10-3-76 | On 12-17-76, the administration agreed to appoint a qualified person to fulfill this need. On 3-23-77, the administration stated that there was no one available for that position. Subsequently, such a person was appointed. |
| 12. The council submitted a committee report on the plumbing problems in the honor dorm laundry room and in several bathrooms. | 12-4-76 | The bathrooms have been repaired to some extent, but the plumbing in the laundry room continues to be in disrepair. |
| 13. The council proposed that GED classes be provided for honor dorm inmates. | 12-27-76 | No formal response has been given to the council. |
| 14. The inmate council submitted a list of equipment needs for recreation. | 1-27-77 | Although all of the items on the list were not supplied, a substantial improvement was made in this area. |
| 15. The council requested that a used or new clothes dryer be purchased for the honor dorm laundry. | 2-11-77 | A used dryer was delivered on 6-16-77, but it has not yet been installed. |
| 16. The council suggested that the furlough procedures be reevaluated and modified. | 2-22-77 | On 4-26-77, the administration explained the furlough procedures to the council and resolved problems that did not create a conflict with Administrative Regulations. |
| 17. The council indicated the need for additional emergency equipment in the honor dorm medical room. | 4-25-77 | The administration increased the medical supplies available in the honor dorm. |
| 18. The council requested that the administration review a set of newly posted honor dorm rules. | 9-12-77 | Of the five rules that the council found to be objectionable, one rule was modified, two rules were reexamined and recommendations for change were accepted. It was decided that the remaining two rules would continue to be enforced, but compromise was reached concerning the scope of the rule. |

Of the 18 proposals described above, 17 have received formal responses and 12 have produced action by the administration. While the administrative response has not always been completely satisfactory to the council, substantial progress had been made on a number of issues. In some cases, implementation of agreed changes has been much too slow, e.g., installation of a clothes dryer which was delivered to the institution on June 16, 1977. While staff liaison has been more effective with respect to the honor dormitory council, contact between the group and the liaison staff member has been uneven. More frequent and regular meetings between the council and the liaison staff, regular contact between the council and the Superintendent, and greater attention to the speedy implementation of approved proposals are necessary at this time.

One reason for the relative success of the honor dormitory council may have been its relatively small size. This council is made up of six representatives and 12 alternates. After discussions about the state in which the stockade council found itself, the Superintendent and the Special Master agreed to suggest to the stockade organization that six standing committees of the council be established. One of the six committees will be concerned with each of the following areas: food service; mail and visiting; medical service; recreation; safety and sanitation; and policy.

Appointment to the standing committees will be made by the council, which will retain its present organizational structure. The Superintendent will appoint a member of his staff in each of the relevant areas of concern to act as staff liaison and meet regularly and frequently with each standing committee. The function of staff liaison will be to assist the committee in the development of proposals for submission to the Superintendent and to see to it that proposals which are approved are implemented as fully and quickly as possible.

The various inmate committees will report back on their efforts and progress to the entire council. Election of council members will be unchanged by the new procedure, and the council will continue to meet as a body on a regular basis.

The stockade council agreed to this proposed change on October 22, 1977. The hope is that the new arrangement will provide for more effective staff assistance and input while making it easier for small groups of inmates to develop viable proposals for presentation to the administration.

Before the new system could be implemented in the stockade, a work stoppage occurred from October 31 through November 2, 1977. At the time of the stoppage, the Superintendent announced that he would not meet with any group of inmates other than the duly elected inmate council. As a result of the discussions which the Superintendent conducted or authorized with the council, the stoppage was brought to an end without damage or injury. The final resolution was brought about by a vote of the entire population which was reflected by the vote of the council to end the strike.

In announcing the end of the stoppage to each housing unit within the stockade, the Superintendent gave much credit to the inmate council for its responsible negotiations and representation. Hopefully, the council itself gained stature in the eyes of the population. Thus it may be that this unfortunate event will produce the favorable result of altering for the better the relationship between the council and the administration and of increasing the effectiveness and credibility of the council. Since the work stoppage ended, the Superintendent has conducted discussions with the council on a number of important matters which concerned the inmate body. The continuation of an attitude of mutual respect and cooperation, together with the restructuring of the council which was de-

scribed above, offer the best possibilities at this time for the development of an effective council within the stockade.

## CONCLUSIONS

Compliance with the prohibitory paragraphs of the Court's order requires the development of a credible and effective grievance mechanism as well as a permanent and effective inmate council in the stockade and in the honor dormitory at M.C.I. These mechanisms relate as well to compliance and continued compliance with numerous mandatory provisions of the order.

The adoption of the recommendations of the Special Committee to Monitor the Inmate Grievance System will be a significant step in the right direction. In particular, the provision of an element of outside review through the M.C.I. Citizens' Advisory Committee should instill in the system greater objectivity and credibility. The Inspector of Institutional Services at Marion will require increased assistance and training from the Chief Inspector, particularly in view of the heavy workload which the institution's Inspector carries relative to that of his counterparts in other institutions. The grievance system must be used to identify recurring problems, and it is the duty of the Inspector of Institutional Services to develop solutions to these problems when this is possible. In particular, a more effective means of dealing with grievances alleging harassment and inappropriate supervision must be found. Finally, more attention must be given to the inspection as opposed to the grievance resolution function of the Inspector of Institutional Services in order to identify important problems which are not being raised through the regular grievance process.

If this case is ever to end, substantial progress must be made by the Superintendent and his staff liaison in working with the two inmate councils at M.C.I. What has been said above makes it abundantly clear that the administration must take immediate and positive steps to increase the effectiveness and thus the credibility of these groups. This will require the dedicated efforts of the Superintendent and the staff members who are assigned to work in liaison with the honor dormitory council and the standing committees of the stockade council. The recent work stoppage at M.C.I. may illustrate the point that something good can come of everything. At the least, it presents an opportunity for a fresh beginning between the administration and the stockade council—a thing sorely needed at this time. The honor dormitory council will require continued and increased attention from the liaison staff member and the Superintendent. It is the firm conviction of the Special Master that these organizations will succeed if a decision is made by the administration, as it has been by the Special Master, that they *must* succeed.

## PARAGRAPH 1

Since December 27, 1976, 12 incidents of improper opening of legal mail outside the presence of the inmate/addressee have appeared on logs maintained by personnel in the institution's mail room. Of these, 11 were opened accidentally by mail room personnel; no explanation has been found for the twelfth incident which involved a letter addressed to an inmate in the honor dormitory. The Director of Mail received a strong reprimand from the Associate Superintendent for Treatment in connection with this incident. The Superintendent has continued the practice of writing letters of apology to the sender of legal mail which is opened improperly.

Several inmates have raised with the Special Master a matter which relates to the provisions of this paragraph of the Court's order. The Office of the Attorney General makes a practice of sending directly to the Superintendent copies of responsive pleadings filed in habeas corpus and civil rights litigation commenced by inmates against the Superintendent. In the same envelope with the copy sent to the Superintendent is a copy for service upon the inmate. As a result, this piece of "legal mail" is opened by the Superintendent outside the presence of the inmate.

The objection raised by inmates is not that the contents of the legal document are known to the Superintendent; such is bound to be the case in any event. Their concern is that this procedure may result in the delay or loss of important legal mail. The Special Master has raised this matter with the Chief Counsel of the Office of the Attorney General who has agreed to investigate the feasibility of mailing these documents separately to the Superintendent and to the affected inmate. Apparently the only concern of the Office of the Attorney General is the added cost of postage which will be entailed as a result of double mailings.

### CONCLUSIONS

The institution remains in compliance with the provisions of Paragraph 1 of the Court's order. The incidence of error in the opening of legal mail—approximately one item per month—is within reasonable bounds in view of the quantity of mail processed by the institution's mail office. The Superintendent has cooperated in every respect in his efforts to reduce the incidence of error.

In view of the objections which have been encountered from inmates concerning the policy of the Office of the Attorney General, described above, that Office should institute a practice of mailing copies of responsive pleadings directly to the affected inmate.

### PARAGRAPH 2

On May 23, 1977, Professor Rhoda Berkowitz, the Associate Law Librarian at The University of Toledo, conducted an inventory of the honor dormitory library. She conducted a similar inventory of the stockade law library on July 11, 1977. In both instances she reported to the Special Master that all books agreed to be provided by the Department of Rehabilitation and Correction were in fact on the shelves of the two libraries. See *Taylor v. Perini,* 431 F.Supp. 566, 632 (N.D.Ohio 1977). Professor Berkowitz submitted a list of additional materials which she believed should be purchased for the two libraries. That list is attached as Appendix D, p. 90 *infra.* Some months ago the Department agreed to give consideration to the purchase of these materials after both libraries at M.C.I. had been brought up to the Department's basic standard.

Both law libraries are functioning well, and the law clerks have been active in serving inmate/clients. The only difficulty reported to the Special Master relates to the need for photocopy facilities, a matter pointed out by the Special Master in his third report. *Taylor v. Perini,* 431 F.Supp. 566, 575 (N.D.Ohio 1977). The need for photocopy facilities arises in two respects. First, there is the need to permit copying of legal documents required to be filed in numerous copies; second, the inmate law clerks have indicated a need to duplicate cases and statutes for use by other inmates or for use by inmate law clerks in their cells or dormitories.

For various reasons the Superintendent has recommended that the photocopy machines available in the institution not be used for the purpose of copying legal materials for inmates. At the same time, the Special Master made it clear that he did not regard the Department's policy of permitting such copying (at the institution) at a cost of $.50 per page to be a reasonable response to the recommendation made in the Special Master's third report. The solution which has been recommended by the Superintendent consists of the use of an outside commercial printing service to make copies of these documents, cases, and statutes.

The procedure will be that legal papers and books which are to be copied will be picked up in the law library six days a week. They will be taken by mail personnel into the City of Marion where same-day service will be provided. Inmates will be required to sign a cash slip before the copying will be done, but credit will be extended if necessary to permit the copying to be done. The cost to the inmate will be $.12 per page. While this will not permit inmates (including the law clerks) to obtain

free copies of legal materials for use in their cells or dormitories, the solution posed by the Superintendent appears to be a reasonable one. Although the Superintendent has assured the Special Master that the documents will not be read by mail room personnel who deliver them for copying, some inmates may be concerned about the matter of confidentiality. In these cases, typed copies may be made in the law library. In addition, The University of Akron College of Law will make photocopies available to inmates at $.05 per page. While this entails a necessary element of delay, the three options available to inmates and inmate law clerks represent a satisfactory effort on the part of the institution to make photocopy facilities available for the copying of legal documents and legal materials.

### CONCLUSIONS

The institution is in full compliance with the provisions of this Paragraph of the Court's order. Although the Special Master hopes that the Department will consider the purchase of some or all of the legal materials specified by Professor Berkowitz, the present collection in the two M.C.I. libraries constitutes full compliance with Paragraph 2 insofar as that portion of the order requires the maintenance of an adequate legal collection. The Special Master's finding of compliance, however, assumes the immediate adoption of the photocopy system described above.

### PARAGRAPH 3

Reports from inmate law clerks indicate that the institution remains in full compliance with the requirements of this paragraph that paper, pencils, pens, notarial services and postage be provided to inmates without charge or on credit for use in the preparation and mailing of legal documents and correspondence.

### PARAGRAPH 4

The institution remains in full compliance with this paragraph of the Court's order relating to screening of incoming publica-

tions on the basis of obscenity or clear and present danger to the safety or security of the institution. The procedures and policies adopted at M.C.I. have resulted in a drastic reduction of the quantity of incoming printed material which is denied inmates. Those materials which continue to be denied fall reasonably within the criteria for exclusion which have been approved by the Court. *Taylor v. Perini*, 421 F.Supp. 740, 775 (N.D. Ohio 1976). The procedural requirements of the screening system are being met without exception.

Seven appeals from decisions of the M.C.I. Publications Screening Committee were instituted by inmates between January 1, 1977 and the date of this report. In every instance the inmate's appeal was denied by the Departmental Publications Screening Committee. In every case, however, the Departmental Committee took action within 28 working days as required by the Court's order.

Although the Departmental Committee continues to be bound by the provisions of Administrative Regulation 5120–9–19 which contains the same criteria for determination of obscenity and clear and present danger which have been approved by this Court for use at M.C.I., the Departmental committee has placed several publications on its "not to be permitted" list which fail to meet the criteria established by the Administrative Regulation. Examples of materials which appear on the "not to be permitted" list because they constitute a "clear and present danger" are *Black Voices From Prison, Malcolm X Talks to Young People, The Revolutionary Dynamics of Women's Liberation,* and *Why Women Need the Equal Rights Amendment.* These works have been examined by the Special Master, and they clearly fall within the scope of legitimate political expression. They are not "inflammatory" within the meaning of that term established by subsection 2 of Administrative Regulation 5120–9–19. In addition, the "not to be permitted" list contains a number of publications which have been excluded on the basis of "obscenity" although these publications are generally available

for sale to the public in reasonably tolerant urban areas. Examples in this category include *Adam, Penthouse, Playgirl,* and *Playgirl Advisor.* These materials are routinely admitted at M.C.I. by the institutional Publications Screening Committee applying virtually the same standards for exclusion. In the opinion of the Special Master, the Departmental Committee is clearly in error in designating these publications as "not to be permitted."

It should be stressed that the presence of these publications on the "not to be permitted" list has not resulted in their exclusion from M.C.I. The reason for this is that the institution has not been allowed by the Special Master to rely upon the Department's "not to be permitted" list. (Materials on the Department's "to be permitted" list, of course, are admitted routinely at M.C.I., since any appeal of an adverse decision would be granted automatically by the Departmental Committee.)

Finally, no steps have been taken by the Department to amend Administrative Regulation 5120–9–19 to conform with the requirements imposed upon M.C.I. by this paragraph of the Court's order. See *Taylor v. Perini,* 431 F.Supp. 566, 578–579 (N.D. Ohio 1977). Again, while these defects in the Administrative Regulation are not affecting Marion, the failure to bring the Departmental policy into line with the requirements of *Taylor v. Perini* must of necessity prevent the application of the Departmental regulation to M.C.I.

## CONCLUSIONS

The institution remains in full compliance with the requirements of Paragraph 4, and the Departmental Publications Screening Committee has come into compliance with the requirement that Marion inmates be notified of the decision on appeal within 28 working days from the time of the filing of an appeal from a decision of the institutional committee. The use at M.C.I. of the Departmental "not to be permitted" list or the application to that institution of certain provisions of Administrative Regulation 5120–9–19, on the other hand, would result in substantive violations of the Court's order. The Department has been aware of the need to revise Administrative Regulation 5120–9–19 since the Court's confirmation of the Special Master's third report on March 18, 1977; the Department's Publications Screening Committee has been aware of the difficulties presented by the "not to be permitted" list since the Special Master met with that Committee on June 21, 1977.

It is the recommendation of the Special Master that the Department be enjoined from applying to M.C.I. those provisions of Administrative Regulation 5120–9–19 which are inconsistent with the Court's order until and unless the Administrative Regulation is amended to conform to the requirements of Paragraph 4. The Special Master recommends that the defendant Superintendent be permanently enjoined from relying upon the Department's "not to be permitted" list. In view of the practices of the Departmental Committee, a lengthy period of monitoring of that Committee's actions would be required to establish conformity with the substance of the Department's criteria for obscenity and clear and present danger. In view of this, the interest of termination of the mastership appears to require the issuance of a permanent injunction against the use of the "not to be permitted" list at M.C.I.

## PARAGRAPH 5

On September 23, 1976, the Court granted the motion of the defendant for a finding of compliance with Paragraph 5 with the understanding that the honor dormitory law library would be completed. *Taylor v. Perini,* 421 F.Supp. 740, 742 (N.D.Ohio 1976). As this report indicates, the honor dormitory law library has been completed. Thus full and final compliance with Paragraph 5 of the Court's order has been achieved.

## PARAGRAPH 6

Paragraph 6 of the Court's order requires fair notice of all disciplinary rules and of the sanctions which will be imposed upon

inmates who violate these rules. The new inmate manual providing these elements of notice has been prepared by the Special Master with the assistance of Jan Glassman, a third year law student at The University of Toledo, after consultation with staff and inmates at M.C.I. A final draft of the proposed manual has been submitted to the defendants and to counsel, and a meeting is scheduled to discuss any final revisions to be proposed. When agreement upon the final text of the manual has been reached, it will be printed and distributed to all inmates in the stockade.

A portion of the stockade manual together with a supplement dealing with the special policies and procedures which relate to the honor dormitory will be prepared in the same manner. A state of full compliance with Paragraph 6 should be able to be reached during the next three months.

### PARAGRAPH 7

The institution remains in full compliance with this paragraph which requires the maintenance of specified policies, procedures, and conditions in the correctional cells in the prison.

### PARAGRAPH 8

On May 6, 1977, the Special Master submitted to the parties a proposed compliance plan with respect to Paragraph 8 of the Court's order. The plan called for the appointment of a full-time Job Counselor to coordinate a job assignment system which the Special Master believed accomplished the purpose of this provision of the order.

After a number of discussions with the Superintendent, agreement was reached on the details of the plan. A full-time Job Counselor was appointed on July 25, 1977, and the final plan was published in August, 1977. The compliance plan is attached as

Appendix E, p. 1225 *infra*, and the position description for the Job Counselor is attached as Appendix F, p. 1230 *infra*.

Before implementation of the new job assignment plan was possible, it was necessary to finalize all inmate job descriptions. One of the first tasks of the Job Counselor was that of reviewing job descriptions which had been prepared by the Special Master with the help of members of the two inmate councils and the various job supervisors. The completed job manuals were delivered to M.C.I. on October 1, 1977.[10] At a meeting on that date a new problem arose which delayed the implementation of the new job assignment system.

On October 1, 1977, Administrative Regulation 5120–5–03 became effective. Under this Regulation the uniform pay scale of $20 per month was altered to provide for sliding pay scales based upon the number of hours per month in the inmate's actual work assignment. Six categories were established with pay scales of (1) no compensation, (2) $5.00 per month, (3) $10.00 per month, (4) $20.00 per month, (5) $24.00 per month, and (6) $28.00 per month. All inmates with jobs at Marion will be entitled to classification in category 4, 5, or 6. A decision was reached to delay the implementation of the new job assignment system until pay scales could be assigned to each position and the pay scale could be indicated on the job descriptions in the job description manuals. In order to determine pay scale for a given job, a decision was required from the institutional Classification Committee; at the same time, certain changes in the institution's work schedule were required in order to qualify a number of inmates for higher pay scales.

During the month of October these and other problems of a minor nature related to the new job assignment system were

---

**10.** If all positions described in the manual were filled, there would be jobs for 271 inmates in the honor dormitory and for 1000 inmates in the stockade during the summer season; there would be jobs for 257 inmates in the honor dormitory and for 966 inmates in the stockade during the winter season. As of September 26, 1977, 221 inmates were enrolled as full-time

students and thus not eligible for other jobs. Population in the institution is now frozen at 1143 in the stockade and 275 in the honor dormitory for a total of 1418. Thus, M.C.I.—unlike many prisons—is capable of providing employment or full-time education for all of its inmates.

worked out, and at the end of the month, the institution was prepared to implement the new job assignment procedure. Implementation was once again delayed, this time because of the work stoppage which began on October 31 and ended on November 2. The new job assignment system was instituted during the week of November 7, 1977.

What follows is a brief description of the manner in which the new job assignment system meets the substantive requirements of Paragraph 8 of the Court's order of July 12, 1972.

1. *There must be precisely worded, job related substantive criteria for job assignment, transfer and removal.* This is accomplished by the Job Description Manuals which will be utilized by the Job Counselor and the four job assignment committees. In addition, copies of the manual will be available in the two inmate libraries in the institution. Several sample descriptions are attached as Appendix G, p. 1231 *infra.*

2. *Any tests, the results of which will constitute criteria for job assignment must be job related.* Few of the job descriptions indicate that testing will be used. When tests are used, as in the example of a typing test for an office clerk, tests are job related.

3. *Job assignment, transfer and removal shall not be employed for punitive purposes, and shall not be related to discipline for rule infractions except insofar as such infractions are job related and manifest inability on the part of the violator to function in the job in question.* As previous reports have indicated, the Rules Infraction Board can only recommend that an inmate be removed from a job for disciplinary reasons; likewise, job supervisors cannot remove inmates unilaterally. All removals are effected by the Reclassification Committee in the case of stockade inmates and through the Honor Dormitory Reclassification Committee in the case of honor dormitory inmates. Records maintained by these committees over the past 18 months indicate that job removals have complied substantially with this portion of the Court's order,

and the new job assignment procedures do not disturb existing removal procedures which have been found to be adequate.

4. *There must be defined procedures for making job assignments, transfers and removals according to the specified substantive criteria, which procedures:*

 a) *Shall provide for centralized responsibility for making such assignments;*

 b) *Shall not allow for deference to the wishes of job supervisors or fellow inmates;*

 c) *Shall not be dependent upon the self-initiative of inmates.*

These provisions of Paragraph 8 raised the most serious impediments to the development of an effective plan of compliance. The arbitrary exercise of power by individual job supervisors must be avoided; at the same time, even with the aid of precisely worded job criteria, the centralized job assignment committees are not as familiar with an inmate's work habits and abilities as is the inmate's job supervisor. Finally, while the system of job assignment should be a fair and non-discriminatory one, there is obvious advantage in preserving some element of incentive by rewarding inmates who are good workers with promotion into better jobs.

The system which is being adopted severely restricts the power of job supervisors by making job assignments dependent upon the seniority of the inmate applicants. All jobs will be bid, and with limited exceptions in the cases of skilled jobs and high security jobs, they must be filled from among the five applicants with the greatest seniority at M.C.I. Because of this feature, the system does not allow for deference to the wishes of job supervisors or fellow inmates. It requires initiative on the part of the inmate only to the extent that it requires him to bid for a job if he wants it. All job openings will be posted publicly in order to advise all inmates of openings, and job bid forms will be simple and freely available. All bidding will be coordinated by the Job Counselor.

In order to reward good service and to match the best inmate with the job, the plan distinguishes between intra-shop and inter-shop transfers. If the job supervisor wishes to do so, he may bid a job in his shop by posting a notice within that shop. Only his existing inmate/employees may bid, and the job supervisor must select an applicant from among the five bidding inmates with the highest prison seniority. The decision of the job supervisor is subject to review by the relevant central assignment committee. Jobs which are not filled in this manner are bid throughout the institution, and all inmates who have been on their job assignments for 90 days or more may bid. These inter-shop vacancies will be filled by the central job assignment committee. Likewise, an inmate's first job in the institution will be assigned by the central committee after the Job Counselor has interviewed the inmate to determine his job interests. Under the new system, initial assignments will be to a specific job rather than only to a particular shop. This has the effect of decreasing the authority of the job supervisor and the power of fellow inmates.

At every stage, the new Job Counselor will be involved in job assignments and transfers. He will attend all central committee meetings and work with job supervisors. He will be aware of all job postings, both intra-shop and inter-shop, and will monitor the entire system to be certain that it complies in operation with the requirements set forth. He will be available for counseling both new and old inmates, and will serve as an agent for resolution of inmates' job related complaints. While the Inspector of Institutional Services will be available as well to resolve job related grievances, the Job Counselor may be able to effect resolution by talking to a job supervisor, counseling the inmate, or giving advice to the central assignment committee. In order to avoid the influence of other inmates, the Job Counselor will be assisted by a civilian secretary rather than an inmate clerk.

The new job assignment system requires racial balance in all employment units and job categories employing four or more inmates. A 20% deviation from the racial makeup of the prison population is permitted. Job supervisors who fail to follow the mandated procedures will be subject to disciplinary action under section VIII of the plan.

In the opinion of the Special Master, the new job assignment system meets the substance of Paragraph 8 of the Court's order while preserving a worthwhile degree of authority in the individual job supervisors. The system will be an open one, eliminating the need on the part of inmates to curry favor with fellow inmates or job supervisors in order to obtain assignments. The discretion of all staff members charged with job assignment will be severely limited by the use of a seniority system; at the same time, the new procedures provide a necessary degree of incentive and reward.

## CONCLUSIONS

With the actual implementation of the new job assignment system, the defendants came into compliance with Paragraph 8 of the Court's order. In order to remain in compliance, the institution must abide by the provisions of the plan, and the Job Counselor must monitor compliance on the part of job supervisors and the central assignment committees. In the opinion of the Special Master, additional monitoring by the Special Master will be needed in order to determine whether the new system is in fact accomplishing the objectives of the Court's order with respect to job assignment, transfer and removal.

## PARAGRAPH 9

Compliance with respect to this Paragraph of the Court's order has been defined in terms of achievement of racial balance in the twelve affected employment units which reflects the racial balance of the overall stockade population, allowing for a deviation factor of $\pm 10\%$. *Taylor v. Perini,* 431 F.Supp. 566, 591 (N.D.Ohio 1977). As of August 31, 1977, racial balance had been achieved in ten of the affected employment units. At that time the stockade population was 53% black and 47% white and the ten

employment units reflected the following percentages:

| Employment Unit | %Black | %White |
|---|---|---|
| Office Workers | 46 | 54 |
| Porters | 59 | 41 |
| Plumbing Shop | 63 | 37 |
| Carpenter's Shop | 45 | 55 |
| Commissary | 53 | 47 |
| Hospital (Infirmary) | 53 | 47 |
| Dental Clinic | 50 | 50 |
| Cafeteria (Stockade) | 45 | 55 |
| Laundry | 58 | 42 |
| Custodial School (Safety & Sanitation) | 57 | 43 |

By November 1, 1977, the two remaining shops were brought into balance with the stockade population by which time the stockade population was 54% black and 46% white. The two remaining employment units reflected the following percentages:

| Employment Unit | %Black | %White |
|---|---|---|
| Electric Shop | 57 | 43 |
| Trash Run | 50 | 50 |

However, by November 1, 1977, with a racial distribution of 69% blacks and 31% whites, the laundry was no longer in compliance.

Although all twelve of the affected employment units have never been within the ±10% deviation simultaneously, and the Special Master recognizes that the defendants could be required to accomplish this, he believes that the administration has rectified the present effects of past discrimination with respect to these employment units. Therefore, the twelve affected employment units should be treated similarly to the remaining employment units in the institution and compliance should be monitored in accordance with the ±20% deviation established by the Paragraph 8 compliance plan which has been discussed above.

With the adoption of the new job assignment system, procedures exist to prevent assignments to the employment units specified in this paragraph from being made in a discriminatory manner.

CONCLUSIONS

The Special Master, having determined that the defendants have come into compliance with this paragraph of the Court's order, recommends that inmates be assigned to the employment units specified in this paragraph in accordance with the job assignment system developed for compliance with Paragraph 8 of the Court's order.

PARAGRAPH 10

Written rules prohibiting racial discrimination, harassment, intimidation and insult were published in a new staff manual issued by M.C.I. in June, 1977. The manual was distributed to all existing staff members and is given to new employees at the time of their initial training program. The publication and distribution of this manual constitute full compliance with subparagraph 10(a) of the Court's order.

Full compliance with subparagraph 10(b) was reported in the Special Master's second report. *Taylor v. Perini*, 421 F.Supp. 740, 770 (N.D.Ohio 1976).

The staff orientation program mandated by subparagraph 10(c) is accomplished in the course of the five-day training program in which all new employees participate. During the first day of training, employees are introduced to the Equal Employment Opportunity policy of the Department and the institution. Later on the same day, employees attend a one and one-half hour session on "Human Relations—Working with Inmates" which includes materials on black and minority group awareness. An additional hour of training on human relations and officer/inmate relations begins the second day of training. On the fourth day of training, employees are exposed to the institution's inmate grievance procedures, and the fifth day includes a session on employee grievance procedures. In the opinion of the Special Master, this five-day program constitutes compliance with the requirements of subparagraph 10(c).

In August 1977, Personnel Decisions Research Institute submitted a final report of its year-long project designed to develop an effective psychological screening mechanism for incoming correctional officers at M.C.I. Together with that report, P.D.R.I. submitted the test which it developed for this purpose. This test, the Marion Correctional Officer Psychological Inventory (MCOPI) was subsequently approved by the Department of Rehabilitation and Correction and the Department of Administrative Services for use at Marion Correctional Institution.

The purpose of the test is to accomplish the objectives of the following amended language of subparagraph 10(d) of the Court's order:

> A plan for the pre-hire administration to candidates for correctional officer positions of psychological screening procedures designed to disclose emotional instability, inability to take effective action under stress, likelihood of inappropriate use of force, excessive authoritarian attitudes, or tendency to engage in unjustified differential treatment toward inmates based upon race or national origin, with the objective of assessing propensity for racism, sadism, or brutality, and to assist in selecting candidates most likely to have a helpful, client-service orientation. *Taylor v. Perini,* 431 F.Supp. 566, 592 (N.D.Ohio 1977).

The MCOPI will replace the current Ohio Civil Service Test for applicants for employment as correctional officers at M.C.I. The test will be administered and scored by personnel employed by the Department of Administrative Services utilizing scales developed by P.D.R.I. Because experience on the job as a correctional officer at M.C.I. will contaminate the results of the test and render it unreliable, the Department of Administrative Services has agreed to schedule the test in Marion on a monthly basis to avoid the phenomenon of provisional hiring which was common when the former Civil Service Test was used. The Department of Administrative Services will make what is known as a "continuous posting" of the examination which will permit the test to be given on an emergency basis on approximately two weeks' notice.

Commencing in March, 1977, all applicants for employment as correctional officers at M.C.I. were required to take a tentative screening battery developed by P.D.R.I. The contents of this battery were described in the Special Master's third report. *Taylor v. Perini,* 431 F.Supp. 566, 593 (N.D.Ohio 1977). Of 114 persons who have taken the tentative screening battery, 29 have been identified as being unsuitable for employment; none of these 29 individuals have been hired. The tentative screening battery will continue to be utilized until the MCOPI is given.

Prior to the first administration of the MCOPI, the former Civil Service Test will be administered to all employees at M.C.I. who occupy provisional status as a result of their not having taken the former Civil Service Test. (Many of these persons have been screened by the tentative screening battery.) Because these persons have been on the job as correctional officers at M.C.I., the results of the MCOPI would not be reliable. For the same reason, uncertified correctional officers whose positions are financed under the Comprehensive Education and Training Act (CETA) and who wish to achieve certified status will take the former Civil Service Test at the same time. Thus the administration of the former test on a one-time basis will set the stage for the future exclusive use of the MCOPI. This administration of the former Civil Service Test occurred on November 15, 16, and 17, 1977, and the MCOPI will be administered for the first time in December, 1977.

At the time of its adoption of the Special Master's third report, the Court left open the question of whether it would require the Department to conduct a follow-up longitudinal empirical validation study to provide evidence for the criterion-related validity of the MCOPI. *Taylor v. Perini,* 431 F.Supp. 566, 568–569 (N.D.Ohio 1977). The need for such a study is described in that report. *Id.* at 594. This question has been mooted by the Department's decision

to conduct such a follow-up study and to employ P.D.R.I. for that purpose. The Department's decision to conduct the project and to employ P.D.R.I. was based upon a proposal from the Institute for a study which will consume two years and cost approximately $60,000. The Law Enforcement Assistance Administration has approved a grant in the amount of $29,250 to cover the first year's costs, and according to a letter written by the Administrative Legal Assistant to the Department of Rehabilitation and Correction, "Since the project is approved for twenty-four months, it is my understanding that additional funds will be made available as needed." [11] On October 7, 1977, the Department submitted a contract for the study to P.D.R.I., and the parties have since signed an agreement. The State Controlling Board approved that contract on November 7, 1977, and the follow-up study is now underway.

During the course of the study, P.D.R.I. will administer the MCOPI to incoming correctional officers at several or all of Ohio's adult correctional institutions other than Marion Correctional Institution. Scoring will be done by P.D.R.I. and score reports will *not* be supplied to the Department or to the hiring institution. Persons who have taken the MCOPI and who are subsequently employed will be evaluated on the basis of their actual on-the-job performance. After a sufficient number of persons have taken the MCOPI and have worked as correctional officers for at least six months, P.D.R.I. will be in a position to determine whether or not the MCOPI appears to be identifying the characteristics which it is designed to identify. If the test is validated at these institutions, it will replace the current Ohio Civil Service Test for applicants for correctional officer positions at all of Ohio's adult correctional institutions. The validation of the MCOPI as a result of the follow-up study will reinforce P.D.R.I.'s professional judgment of its validity at Marion Correctional Institution.

With the adoption of the MCOPI at Marion Correctional Institution, the defendants have achieved full compliance with subparagraph 10(d) of the Court's order.

Subparagraph 10(e) requires the development of an in-service training program for staff members at M.C.I. The final report which was submitted by Personnel Decisions Research Institute suggested a number of methods which could be used in training existing staff but did not attempt to develop any kind of comprehensive training program for M.C.I. At the request of the Special Master, the Training Officer at M.C.I. developed several proposals for such a program. The first relies upon the training program conducted at the Ohio Peace Officer Academy and permits an in-service training component of 40 hours to be offered to all *correctional officers* every two and one-half years. By increasing the M.C.I. Ohio Peace Officer Academy training quota from two correctional officers to three, retraining could occur every two years.

The Training Officer has developed a program for in-house retraining as well. Under this plan, 16 hours of retraining could be offered to *all employees* every year; in the alternative 24 hours of retraining could be offered every two years. This proposal would require the addition of four full-time correctional officers as well as another full-time or part-time training officer.

These proposals are under study at this time by the Department of Rehabilitation and Correction. The program which ultimately is adopted must provide retraining for all employees who have significant direct contact with inmates. Although the Ohio Peace Officer Academy program contains a human relations component of four hours, the emphasis of that program is primarily upon custody and security. By adopting an in-house program, M.C.I. would be supplementing the Ohio Peace Officer Academy course which will be available to M.C.I. correctional officers every two and one-half years in any event.

The elimination of racial discrimination, harassment, intimidation, and insult consti-

11. Letter from Stephen T. Yost to Cary Rodman Cooper, May 18, 1977.

tutes the pervasive theme of the Court's order of July 12, 1972. In the opinion of the Special Master, the adoption of an effective program for retraining in human relations skills and attitudes is essential to accomplish this purpose. While the newly adopted MCOPI will result in the employment of correctional officers whose personality is suited to the responsibilities which they will bear, regular and frequent reinforcement of positive attitudes is required in order to maintain a staff which is sensitive to the "nature, needs, aspirations and problems of the diverse racial, cultural, and ethnic groups which comprise the inmate population." *Taylor v. Perini,* 413 F.Supp. 189, 197 (N.D.Ohio 1976). In the opinion of the Special Master, only the development of an effective annual retraining program for all M.C.I. employees who have significant direct contact with inmates as a *supplement* to the Ohio Peace Officer Training program for correctional officers will meet the minimum requirements of subparagraph 10(e) of the Court's order.

Subparagraph 10(f) requires the development of an inmate orientation program to combat racial discrimination, harassment, intimidation, and insult on the part of members of the inmate population. New inmates are received at M.C.I. every Wednesday morning and participate in an orientation program on Thursday and Friday. A standard orientation schedule has been developed which permits a presentation by representatives of the stockade inmate council for approximately 30 minutes. In addition, 45 minutes are allocated to the Psychology Department and are used to accomplish the following stated objectives:

1. To encourage integration between staff and orientation inmates in regard to their attitudes and prejudices toward others;

2. To present appropriate alternatives to prejudicial attitudes.

3. To discuss values, needs, and problems in the correctional setting in regard to inmate/inmate and inmate/staff relations.

Although the institution's description of its inmate orientation program provides for a one-hour presentation by a member of the Psychology Department, only 45 minutes are allocated on the schedule. During this brief period, an effort is made as well to explain to the inmates the services available in the Psychology Department. Obviously, a single session of this kind can have only limited impact upon incoming inmates; at the same time, it serves an effective purpose in apprising the inmates of the fact that the institution is concerned about these problems. It is the recommendation of the Special Master that the time allotted for the purposes required by subparagraph 10(f) be increased to at least one and one-half hours. If necessary, the 45 minutes allotted to the Psychology Department on Friday could be used to explain the services available in that department. One hour could be allotted on Monday morning, which is now designated as "open time," for dealing with inmates' attitudes on the subjects of racial discrimination, harassment, intimidation, and insult.

In his third report, the Special Master stated that he was working with the Director of Publications and Graphics at The University of Toledo to develop a "packaged" program, relying heavily upon visual aids, for use in connection with the inmate orientation program. Such a program has not been developed, primarily because of the demands of that person's other responsibilities. Having observed the presentation of the Psychology Department in connection with the inmate orientation program, it is the opinion of the Special Master that the present program, when provided with a sufficient length of time for presentation as suggested above, will constitute full compliance with subparagraph 10(f) of the Court's order.

As was indicated by the Special Master in his second report, the provisions of subparagraph 10(g) appear to have been superseded by the appointment of the Special Master. *Taylor v. Perini,* 421 F.Supp. 740, 771 (N.D. Ohio 1976).

The defendants are presently in a state of full compliance with subparagraphs 10(a), 10(b), and 10(c) of the Court's order of September 12, 1972. When the MCOPI comes to be actually administered at M.C.I., the defendants will be in a state of full compliance with subparagraph 10(d). By adopting the recommendations made by the Special Master in his discussion of this paragraph of the Court's order, the defendants will achieve a state of full compliance with subparagraphs 10(e) and 10(f). Subparagraph 10(g) is no longer relevant to this litigation.

### PARAGRAPH 11

Compliance with respect to this paragraph of the Court's order has been defined as assignment of inmates to various housing units within the stockade to reflect the racial balance of the overall stockade population, allowing for a deviation factor of ±5%. *Taylor v. Perini,* 421 F.Supp. 740, 774 (N.D.Ohio 1977). Compliance is measured on a monthly basis by averaging the weekly report for each cellblock and dormitory. It was agreed that dormitories 2B, 5 and 5E would be excepted from compliance standards if assignment to those dormitories continued to be based upon participation in the institution's college and drug rehabilitation programs. These three dormitories continue to be utilized for programming purposes and thus should be excepted from the compliance standard.

The following data with respect to the stockade housing areas are based upon reports submitted by the institution on October 4, 1977, October 12, 1977, October 18, 1977, and October 25, 1977. Both whole numbers and percentages are an average of figures submitted for those weeks. The racial distribution in the stockade for the month of October 1977, was 54.5% black and 45.5% white.

| Living Unit | # Black | # White | % Black | % White |
|---|---|---|---|---|
| 1 Dormitory | 31.25 | 30.5 | 50.6 | 49.4 |
| 1A Dormitory | 39.5 | 22.5 | 63.7 | 36.3 |
| 2 Dormitory | 37.0 | 27.0 | 57.9 | 42.1 |
| 3 Dormitory | 33.75 | 30.0 | 52.9 | 47.1 |
| 3C Dormitory | 45.25 | 18.75 | 70.7 | 29.3 |
| 4 Dormitory | 41.75 | 22.25 | 65.2 | 34.8 |
| 4D Dormitory | 32.25 | 31.75 | 50.4 | 49.6 |
| 6 Dormitory | 31.75 | 32.25 | 49.6 | 50.4 |
| 6F Dormitory | 30.5 | 32.75 | 48.2 | 51.8 |
| | | | | |
| 1 Cellblock | 39.0 | 27.5 | 58.6 | 41.4 |
| 2 Cellblock | 37.25 | 28.8 | 56.7 | 43.3 |
| 3 Cellblock | 35.75 | 29.5 | 54.8 | 45.2 |
| 4 Cellblock | 38.25 | 28.25 | 57.5 | 42.5 |
| 5 Cellblock | 31.5 | 27.5 | 53.4 | 46.6 |
| 6 Cellblock | 33.75 | 33.5 | 50.2 | 49.8 |

These data establish that the following housing units are in compliance with Paragraph 11 of the Court's order: dormitories 1, 2, 3, 4D, and 6, and cellblocks 1, 2, 3, 4, 5, and 6. The following dormitories are not in compliance: 1A, 3C, 4, and 6F. Thus, of the nine dormitories in the stockade subject to the compliance standard, four remain in a state of noncompliance while all of the cellblocks are in a state of compliance.

In the honor dormitory, the racial distribution of the population for the month of October, 1977, was 61.6% black and 38.4%

white. Data submitted by the institution for the weeks of October 4, 1977, October 11, 1977, October 18, 1977, and October 25, 1977, indicate the following:

| Bay | # Black | # White | % Black | % White |
|-----|---------|---------|---------|---------|
| North | 75.25 | 43.75 | 63.2 | 36.8 |
| East | 69.0 | 46.0 | 60.0 | 40.0 |

Thus, the defendants are in a state of compliance in both bays of the honor dormitory.

The bed patterns within the honor dormitory continue to indicate improved racial distribution and the practice of maintaining segregated rows within the bays has ceased. There continue to be concentrations of black and white inmates within the rows, however, and efforts must be made to distribute inmates more evenly within the honor dormitory. The bed patterns within the stockade dormitories have improved as well; however, the assignments within the cellblocks have produced significant racial concentrations.

## CONCLUSIONS

Although the defendants remain in a state of noncompliance in four dormitories within the stockade, efforts have been successful in desegregating 13 housing units throughout the entire institution. The Special Master has acknowledged that difficulty exists in achieving compliance in those dormitories which have a history of being prone to violence. In the opinion of the Special Master, the prison's administration has made a long and continuing good faith effort to achieve compliance with this paragraph of the Court's order. Unless the Court is prepared to order wholesale bed transfers based upon race alone and to eliminate the institution's policy of permitting voluntary transfers—both of which in the opinion of the Special Master would be ill advised, the Court must accept the possibility that full and literal compliance may never be achieved in several dormitories within the stockade.

## THE POSTURE OF THIS LITIGATION

Almost two years have passed since the appointment of the Special Master in this case. With the submission of this, the fourth report on the defendants' state of compliance, the time has come to begin to consider the prospect of the termination of the mastership.

Full compliance has been achieved or can be achieved very quickly with respect to all of the 13 mandatory paragraphs of the Court's order of September 12, 1972, with the possible exception of Paragraph 11. Compliance with the two prohibitory paragraphs, on the other hand, will require a more substantial effort, the effect of which will be more difficult to measure. The questions of whether or not permanent and effective inmate councils have been created within the institution and of whether or not the inmate grievance system is operating effectively can be answered only in terms of the extent to which these mechanisms appear to be structurally sound as well as reasonably responsive to the problems with which they are intended to deal. In spite of the dissatisfaction which the Special Master has expressed concerning events relating to the inmate councils over the past eight months, he believes that a concentrated effort on the part of the Superintendent and his senior staff can bring about a positive change within a relatively short period of time. With respect to the inmate grievance system, the Special Master believes that with careful implementation and training, the use of outside reviewers will be successful and that the system which will emerge will be one of the better inmate grievance mechanisms in the United States.

Litigation of the magnitude of *Taylor v. Perini* will always produce loose ends. This is true because the fundamental and complex issues of this case are not fully susceptible to solution. The function of the Special Master has been to develop and implement policies and procedures which would bring about a change in the actions, and thus ultimately in the attitudes, of the defendants. As the Court has recognized,

Actions can be controlled by orders which are within the power of the Court. Atti-

tudes are perhaps not susceptible to change by the direct orders of the Court, but this Court adheres to the James-Lange theory that attitudes proceed from actions, and not vice versa. Hence if the actions are changed, a change in attitude will follow, even though it could not have been compelled to begin with. *Jones v. Wittenberg,* 330 F.Supp. 707, 713 (N.D. Ohio 1971).

While it can always be argued that the defendants should be required to do more, that the solutions which have been found could be improved upon, and that the defendants have not established to the extent that they should be required to do so that the new policies and practices which they have adopted will be permanent, the difficult task for the Court is that of determining when the continuation of the mastership has reached the point of significantly diminishing returns.

In the opinion of the Special Master, a monitoring period of some four to six months will be needed to determine the effectiveness of the new job assignment system and to implement and monitor the use of outside reviewers in connection with the inmate grievance system. During this period of time, other compliance plans which will not require extensive monitoring such as the development of an effective in-service training program can be implemented. At the same time, monitoring can continue with respect to the progress of the inmate councils and other compliance plans which have been in effect for some time.

Therefore, it is the recommendation of the Special Master that a period of continued implementation and monitoring should commence with the Court's adoption of this report with a view toward producing a fifth report on the state of the defendants' compliance. *If the predicted progress on the part of the defendants is reflected in that report,* its adoption by the Court should be coupled with an order dismissing the Special Master.

Respectfully submitted.

s/ <u>Vincent M. Nathan</u>
Special Master

## APPENDIX A

### SPECIAL COMMITTEE TO
### MONITOR THE INMATE GRIEVANCE SYSTEM

REPORT TO THE

Director, Department of Rehabilitation and Correction

and

Special Master, Taylor vs. Perini
United States District Court for the Northern District of Ohio

June 1977

John P. Conrad, Chairman
William L. Howland
Mrs. Agnes Jackson
Walter D. McClaskey
Harrison Morris
Norman G. Zemmelman

REPORT OF THE SPECIAL COMMITTEE TO MONITOR THE INMATE GRIEVANCE SYSTEM

*Charge to the Committee:*

(1) The Special Committee to Monitor the Inmate Grievance System was jointly appointed by Director George F. Denton and Vincent M. Nathan, Special Master in the case of *Taylor v. Perini,* in a memorandum' dated 7 January 1977. The Committee was charged with the tasks of studying and evaluating the revised inmate grievance system in the Department of Rehabilitation

and Correction. In particular, the Committee was requested:

> "to ascertain whether the grievance system is effective, independent, and feasible; and, if not, to recommend such modifications as would accomplish those objectives."

The Committee consists of six members: John P. Conrad, Columbus; William Howland, Portsmouth; Agnes Jackson, Toledo; Walter McClaskey, Marion; Harrison Morris, Columbus; Norman Zemmelman, Toledo. Mr. Conrad was designated as Chairman by the appointing authorities.

(2) Procedures: The Committee has met at each of the institutions in accordance with the following schedule:

| | |
|---|---|
| 7 February: | Marion Correctional Institution |
| 7 March: | Ohio State Reformatory at Mansfield |
| 13 April: | Lebanon Correctional Institution |
| 18 April: | Lebanon Correctional Institution |
| 2 May: | Southern Ohio Correctional Facility |
| 3 May: | Chillocothe Correctional Institute |
| 9 May: | Correctional Medical and Reception Center at Columbus |
| 10 May: | Marion Correctional Facility |
| 20 May: | London Correctional Institution |
| 8 June: | Columbus—Department Headquarters |
| 9 June: | Final Meeting—Columbus. |

---

In addition to the scheduled meetings listed above, all members of the Committee attended workshops conducted by the staff of the Center for Correctional Justice and funded by the National Institute of Law Enforcement and Criminal Justice.

At each of the institutions visited we enjoyed the courteous participation of the Superintendent and the Inspector of Institutional Services. Our inquiries received full responses, and the institutional staff conducted us on full and unrestricted tours of the facilities. In addition to the local staff, Chief Inspector McKeen and other representatives of the Department Headquarters attended each of our meetings and reported on the operation of the grievance system as seen from the Departmental perspective.

To obtain a more informal view of operations, each member of the Committee arranged for individual visits to the various institutions and filed confidential reports on observations with the other members of the Committee.

It should be clear from the foregoing that we have been an active Committee, despite the fact that each member is an active professional person with many claims on his or her attention. Nevertheless, even though we have given much time to this Committee's charge, we are keenly aware of the limitations which time has placed on our effectiveness. We believe that we can stand by our recommendations but wish that it had been possible to survey the system in greater depth.

(3) *The Departmental Operation of the System:* The implementation of the grievance procedures established in Administrative Regulations 5129-9-29/31 has been rapid and administratively complete. The Chief Inspector has efficiently identified and confirmed the appointments of officers to fill the positions of Inspectors of Institutional Services at each of the institutions. Managing staff have been thoroughly instructed concerning the objectives and requirements of the new system. Inspectors have been convened regularly for training and dissemination of instructions. Reporting procedures have been established and appear to be faithfully carried out. It has been clear to us that all Managing Officers

and their immediate subordinates have been firmly impressed with the Director's desire that the grievance procedures should be effective and efficiently executed.

Although compliance to the letter of the new regulations has been meticulous, we have noted with some concern that the flow of grievances from the institutions to the Chief Inspector has been extremely small. Several of the institutions have not transmitted any grievances for Departmental resolution. The activity of the Chief Inspector appears to have been primarily devoted to review of local operations and the conduct of meetings and training programs. We are of the opinion that Chief Inspector McKeen is well informed concerning the problem areas at each institution and fully cognizant of policy and its implications. However, the reason for the low traffic in formal grievances appealed to his office seems to be directly related to the kinds of topic which may be grieved. Evidently the local Inspectors are able to arrive at a resolution of most of the grievances filed with them which is satisfactory to the inmate grievant. This situation suggests that where grievances have been rejected they have not been of sufficient moment to the inmates concerned to justify further action.

Specifically excluded from the jurisdiction of the Chief Inspector and the local Inspectors are the procedures and decisions of the Parole Board and the Rules Infractions Boards. Our individual contacts with inmates suggest that the actual procedures of these Boards, though not their decisions, may be appropriate subjects for grievances; clearly these two quasi-judicial mechanisms have managerial problems which are of immense significance to inmates when they are not functioning in satisfactory manner. Just as clearly, the decisions of the Parole Board with respect to releasing prisoners or of the Rules Infraction Boards with respect to punishing them are not appropriate subjects for review by the Inspectorate.

(4) *Institutional Programs and Systems:* At each institution the grievance proce-

dures have been disseminated by whatever means available. We are particularly impressed with the vigor with which the dissemination process has been undertaken at Chillicothe and at Lebanon. In both these institutions, the Inspector has regularly been involved in the training program for custodial officers and in the orientation programs for new inmates. Although we heard claims that inmates were not generally aware of the existence of such procedures, we have not discovered many who did not have a general idea of what the grievance system is and what it is supposed to do. On the other hand, we have heard much skepticism about its effectiveness and the intentions of the administration in initiating it. We are well aware that such doubts are to be expected. However, the credibility of the system is impaired by its apparent lack of independence. Although each Inspector seemed to be clearly instructed concerning his subordination to the Chief Inspector, all of them also seemed to be in primary allegiance to the Managing Officer. Under the circumstances, it is not surprising that inmates have articulated to us frequently and sarcastically that there is not much use in complaining to the Establishment about the Establishment. Undoubtedly, at least some of this skepticism will abate as actions favorable to inmates are taken.

Relatively few institutions have used the Inspector for the purpose of inspections. We think that much more attention should be given to this activity, especially at institutions like Mansfield and Lucasville, where crowded conditions create living situations not contemplated in standard operations. The Inspector is specifically intended to be the principal agent to assure the Managing Officer and the Director that laws and policies are faithfully executed to the letter and in the spirit intended. These assurances cannot be based solely on the daily workload of grievance adjustment.

Some further thought should be given to the personal attributes desired in the Chief Inspector and the Inspector. There should

be recognition that the incumbent should be a vigorous official in mid career, with prospects for advancement. Obviously there are unrivaled opportunities provided by the Departmental Inspectorate for incumbents to inform themselves about every aspect of correctional administration. A successful Inspector should be a strong candidate for senior responsibilities, and some of them are. However, we met some whose capacities are obviously taxed by the minimum burdens of the job and whose performance could not be characterized as fully acceptable. The Inspectorate is not a function to assign to the super-annuated.

At this stage we are able to say that a start has been made on the development of an effective system. The leadership of the Director and the Managing Officers will be needed indefinitely if its credibility and effectiveness is to increase. As with any human activity, and especially in public administration, those concerned in it must be highly motivated to achieve and maintain its success. One powerful motivation is to be found in the unique opportunity it presents to remedy unfavorable conditions before they are magnified into the causes of major disorders. We are certain that the officials assigned to the Inspectorate all share this perspective on its possibilities.

(5) *Recommendations:* Our recommendations are addressed first to the Administrative Regulations, and second, to their execution by concerned personnel. We have four recommendations for modification of the Regulations:

(a) *There should be a Permanent External Monitoring Committee.* We are agreed that the credibility of the system depends on its independence. In the climate of any prison, the independence of the system will not be credited without surveillance by a group with no obligations to the Department. We suggest the following structure as a form providing the basic essentials:

(1) The Committee should consist of five members to be appointed by the Gover-nor. One member should be a lawyer, one member should be a behavioral scientist, and a third should be an official of the Department of Rehabilitation and Correction. *We wish to stress that the members of the present temporary committee disqualify themselves from further service in this capacity.*

(2) The Committee should meet quarterly to review the operation of the system, to make suggestions for its improvement, and to certify that it is functioning as intended. Where such certification cannot be made, the Committee should specify the reasons and recommend changes.

(3) The Committee will not act as a board of appeals, but it will nominate independent reviewers to assist in the settlement of grievances in which such support appears to be required by the Chief Inspector. Such situations would be of two kinds: *first,* where the Chief Inspector's resolution is in favor of the Department but the grievant continues to desire a remedy; and *second,* where the resolution is in favor of the prisoner, but the Director wishes to obtain outside views about the issue before adopting the Chief Inspector's recommendation.

(4) Members of the Permanent External Monitoring Committee will arrange for individual visits to each of the Department's facilities in such a way that each prison will be visited at least annually and each committee member will visit at least one prison during the year.

(5) The Committee will submit an annual report to the Governor. Before submission, the report will be transmitted to the Director for his review and comment. The Committee's annual report should be published in the media and made available to members of the General Assembly.

(6) Service on the Committee should be limited to two years, but appointments should be staggered in the interest of continuity.

(b) *The Inspector of Institutional Services at each institution should be appointed by and be under the direct supervision of*

*the Chief Inspector.* Under the provisions of Administrative Regulation 5129-9-29, the Inspector is an appointee and under the supervision of the Managing Officer, but submits monthly reports to the Chief Inspector. In a memorandum to the Chairman of this Committee, Chief Inspector McKeen indicates clearly that the Inspector is subordinate to the Chief Inspector. (See Annex # 1, dated 11 April 1977). We believe that for the maintenance of the credibility of the system it is essential that the Administrative Regulations be amended accordingly. It is to be further understood, of course, that this relationship is not intended to diminish the responsibility of the Managing Officer for the administration of his institution.

(c) *The Administrative Regulations should be much more specific concerning the qualifications and duties of the Chief Inspector and the Inspector of Institutional Services.*

(1) As to the Chief Inspector, we believe these qualifications should be specifically set forth:

(i) One year's experience as an Inspector of Institutional Services.

(ii) Thorough familiarity with custodial procedures and the reasons supporting custodial policies.

(iii) Training in counseling concepts and techniques.

(iv) Successful experience in the Department's program of in-service training.

(2) The Chief Inspector's duties should include, in addition to those already specified in the Regulations:

(i) He shall prepare a syllabus for training in the management of grievance procedures and their purposes.

(ii) He shall supervise the training conducted by Inspectors of Institutional Services for staff and periodical reports concerning the status of training at each institution.

(iii) He shall monitor the orientation of inmates to the use of inmate grievance procedures.

(3) The minimum qualification for appointment to the office of Inspector of Institutional Services should be:

(i) University graduation or its equivalent.

(ii) Experience in counseling.

(iii) At least three year's experience in institutional operations, one year of which should be in a supervisory capacity. Preference should be given, all things being equal, to candidates who have had experience in more than one of the Department's facilities.

Considerable attention was given to the desirable personal characteristics for individuals appointed to this crucial office. While we do not believe it is possible to specify the following intangibles in a list of formal minimum qualifications, the following desiderata should be kept in mind:

(iv) Decisive and independent character.

(v) Conviction of the importance of the assignment.

(vi) Ability to take personal initiatives; the Inspector's role is not wholly reactive; he should be able to conceive and carry out activities which will prevent grievances from occurring.

(4) In addition to the duties specified in the Administrative Regulations, the following should be specified:

(i) He shall have no other assignments than those necessary for the inspection of services and the resolution of grievances.

(ii) He shall personally conduct all training of institutional staff on the operation and purposes of the grievance procedures, and maintain a roster of staff members receiving training.

(iii) He shall personally conduct orientation programs for newly received inmates relative to the purposes and functions of the grievance procedures.

(d) *We recommend that the terminology of "formal" and "informal" grievances be* discarded as confusing and unspecific. In

its place, the Regulations should distinguish between *local* and *appellate* resolution of grievances. Careful accounting for each level of grievance should be provided.

(5) *Recommendations, continued:* In addition to the recommendations for modification of the Regulations, we make the following suggestions for the improvement of operations:

(e) *Inspectors should be encouraged to engage in regular consultation with inmate groups.* Many authorities recommend that inmates should participate in the administration of the system and the adjudication of grievances. We disagree, believing that there is no way of assuring that representative inmates can be found and being further of the opinion that appointment of inmates to such responsibilities would place them in a socially untenable position *vis-a-vis* other inmates. However, we think that communication with the inmate body is essential to a good system. An ad hoc advisory committee on grievances might be an effective solution so long as the committee understood that its advice might be sought but not taken. The Communications Group at the Ohio Reformatory for Women appears to be an effective channel for exchange of information. Other groups, as for example the Jaycees, might also be effectively used. Experimentation is needed; the object is to assure that the system is credible and understood. Where inmate newspapers exist, as at Chillicothe, the Inspector could use a column to discuss types of problems which have come to his attention and the methods he has used to resolve them.

(f) In the preparation of new Administrative Regulations concerning any facet of Department operations, the Chief Inspector should review the draft before publication to determine whether its impact will be such as to produce a new source of grievances. An example in point is the new rule adopted that inmates shall use stamped envelopes in correspondence rather than stamps. This rule produced a considerable number of complaints which might have

been avoided by more forethought and prior review.

(g) Much thought was given to the publication of information concerning the actions to be taken by the Inspectorate where the resolution of a grievance results in disciplinary action for a correctional officer or other staff member. We are divided on our recommendation; the majority would prefer to take the position that grievants should be informed unless there is some overwhelming reason for not doing so. A minority would prefer to leave this matter entirely to the discretion of the Managing Officer.

(h) We have frequently discussed the role of the Managing Officer with respect to the grievance system. All of us are impressed that his support of the system is essential to its success. All of us agree that his role with respect to the Inspector should be limited to information and advice. The appointment and supervision of the Inspectors should be the prerogative of the Chief Inspector as indicated in Section 5(b) above. To a large extent, the Inspector is an administrative assistant to the Managing Officer, and subject to his beck and call for a variety of duties which are not germane to his principal assignment. We recognize the great difficulty which this administrative arrangement imposes on all concerned, but if the system is to be seen as truly independent, it is essential that the formal organizational lines should be meticulously set up and complied with.

(i) It is understandable and laudable that Managing Officers should be active in the hearing and resolution of grievances. Some Managing Officers have indeed been so active in this respect that they seem to be assuming the role of a super-Inspector. Where grievances come first to the attention of the Managing Officer, provision should be made for notifying the Inspector of their nature and resolution.

(j) Only at Lebanon did there appear to be sufficient initiative taken by the Inspector in the conduct of inspections. We be-

lieve that this responsibility is an essential service to the Department. The physical condition of the institution, the distribution of staff, the promptness and adequacy of established services should be the Inspector's daily concern, and his authority should be sufficient to assure that corrective action is taken where required.

## APPENDIX B

LSC 112 0570-1

112th General Assembly
Regular Session
1977–1978

Am. Sub. H. B. No. 305

Messrs. McLin – I. Thompson – McEwen – Cruze – L. Brown –
Orlett – Feighan – E. Hughes – Branstool – Stinziano – Locker –
Cook – R. James – Nixon – J. Thompson – Lehman – Hale – Jones –
Saxbe – Wojtanowski – Begala – Corbin – Skeen – Hartley –
Zehner – Crossland – S. Brown – Sawyer – Malott – Wargo –
Carney – T. Johnson – Healy – Fries – Mrs. Aveni –
Messrs. Damschroder – Carney – Schwarzwalder

## A BILL

To enact sections 103.71 to 103.74 of the Revised Code to establish a correctional institution inspection committee.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF OHIO:

Section 1. That sections 103.71, 103.72, 103.73, and 103.74 of the Revised Code be enacted to read as follows:

Sec. 103.71. There is hereby created a correctional institution inspection committee consisting of eight persons, four of whom shall be members of the Senate appointed by the President Pro Tempore of the Senate, not more than two of whom shall be members of the same political party, and four of whom shall be members of the House of Representatives appointed by the Speaker of the House of Representatives, not more than two of whom shall be members of the same political party. Appointments shall be made within fifteen days after the commencement of the first regular session of the General Assembly in the manner prescribed in this section. A vacancy on the committee shall be filled for the unexpired term in the same manner as the original appointment. Members of the committee shall serve on the committee until the appointments are made in the first regular session of the following General Assembly, unless they cease to be members of the General Assembly.

Sec. 103.72. The correctional institution inspection committee shall, by a vote of at least five members, select from its membership a chairman, vice-chairman, and secretary. The members of the committee shall serve without compensation, but shall be reimbursed for their actual and necessary expenses incurred in the discharge of their official duties.

Sec. 103.73. (A) The Correctional Institution Inspection Committee shall:

(1) Establish and maintain a continuing program of inspection of each state correctional institution used for the custody, control, training, and rehabilitation of persons convicted of crime. The committee may inspect any local correctional institution used for the same purposes. The committee, and each member thereof, shall, for the purpose of making an inspection pursuant to this section, have access to any state or local correctional institution, or to any part thereof, at any time, and shall not be required to give advance notice of, or to make prior arrangements before conducting an inspection.

(2) Evaluate and assist in the development of programs to improve the condition or operation of correctional institutions.

(3) Prepare a report for submission to the succeeding General Assembly of the findings made in its inspections, and of any programs that have been proposed or developed to improve the condition or operation of the correctional institutions in the state. The report shall contain a separate evaluation of the inmate grievance procedure at each state correctional institution. The report shall be submitted to the succeeding General Assembly within fifteen days after commencement of its first regular session.

(B) THE COMMITTEE SHALL make an annual inspection of each state correctional institution, which shall consist of not less than four hours and shall include attendance at one general meal period and one rehabilitative or educational program.

Sec. 103.74. The chairman of the correctional institution inspection committee may appoint subcommittees, each to consist of at least two members, for the purpose of conducting inspections pursuant to section 103.-73 of the Revised Code.

The Committee may employ and fix the compensation of assistants, stenographers, and clerks, and engage the services of whatever technical advisors are necessary for the committee to carry out its duties.

The General Assembly shall biennially appropriate to the correctional institution inspection committee an amount sufficient to enable the committee to perform its duties. Salaries and expenses incurred by the committee shall be paid from that appropriation upon vouchers approved by the chairman of the committee.

Section 2. Initial appointments to the Correctional Institution Inspection Committee shall be made within *fifteen* days after the effective date of this act.

## APPENDIX C

## DEPARTMENT OF REHABILITATION AND CORRECTION
1050 Freeway Drive, North, Suite 403
Columbus, Ohio 43229

JAMES A. RHODES, Governor (614) 466–6190 GEORGE F. DENTON, Director

TO: ALL MANAGING OFFICERS
THROUGH: DIRECTOR GEORGE F. DENTON
FROM: D. R. McKEEN, CHIEF, DIVISION OF SPECIAL SERVICES
SUBJECT: PERFORMANCE EVALUATIONS FOR INSPECTORS OF INSTITUTIONAL SERVICES
DATE: APRIL 5, 1977

As there exists a dual supervision responsibility of the position of Inspector of Institutional Services between your office and the Office of the Chief Inspector, the following procedure for Performance Evaluations shall be implemented.

Whenever Performance Evaluations need to be completed for the Inspector of Institutional Services, the Institution Personnel Officer should forward the appropriate forms to the Chief Inspector.

The Chief Inspector will complete the forms as rater and reviewer. He will also have a discussion with the Inspector of Institutional Services.

Upon completion of the above, the Evaluations will then be returned to the Managing Officer for signature as Appointing Authority.

/s/ D. R. McKeen
 D. R. McKeen, Chief
 Division of Special Services

APPROVED:
/s/ George F. Denton
 George F. Denton, Director

## APPENDIX D

### ADDITIONAL RECOMMENDED BOOK PURCHASES

1. Clark, Homer. *Domestic Relations.* St. Paul; West Publishing Co. (Hornbooks series)

2. Meier, Carl. Anderson's *Ohio Family Law.* Cincinnati; Anderson.

3. Cohen, Morris. *How to Find the Law.* 7th ed., St. Paul; West Publishing Co.

4. Loewy, Arnold. *Criminal Law.* St. Paul; West Publishing Co. (Nutshell series)

5. Handman, Herbert. *The Rights of Convicts.* Dobbs Ferry, N.Y.; Oceana Publishing Co., 1975. (Legal Almanac Series, No. 73)

6. Hermann, Michele. *Prisoners' Rights Sourcebook.* N.Y.; Clark Boardman 1973.

7. Rudovsky, David. *The Rights of Prisoners.* N.Y. Discuss, 1973.

8. *Ohio Criminal Law Handbook.* Cincinnati; Anderson, 1976.

9. Krause, *Family Law in a Nutshell,* West Publishing Co., 1977.

10. *New England Journal on Prison Law,* v. 1—.
Subscriptions from New England College of Law, 126 Newbury Street, Boston, Mass. Semi-annual publications. Cost is $6.00 per subscription.

## APPENDIX E

### M.C.I. INMATE JOB ASSIGNMENTS

The following M.C.I. Inmate Job Assignments procedure is hereby adopted in order to define specified substantive criteria for all inmate job assignments in a uniform and centralized manner rather than to defer to the selection and wishes of job supervisors and fellow inmates.

I. *THE JOB ASSIGNMENT COMMITTEES*

1. In the stockade, initial job assignments will be made by the Classification Committee. The Classification Committee shall be composed of the Associate Superintendent for Treatment, who will serve as chairman, the Inmate Personnel Officer, the Director of Psychological Services, and a representative from the Education Department. The Job Counselor shall be a non-voting member of the Classification Committee.

In the Honor Dormitory, initial job assignments shall be made by the Honor Dorm Placement Committee. The Honor Dorm Placement Committee shall be composed of the Associate Superintendent for Treatment, who will serve as chairman, the Inmate Personnel Officer, the Director of Psychological Services, and a representative from the Education Department. The Job Counselor shall be a non-voting member of the Honor Dorm Placement Committee.

2. In the stockade, job transfers will be made by the Reclassification Committee. The Reclassification Committee shall be composed of the Associate Superintendent for Treatment, who will serve as chairman, the Inmate Personnel Officer, a representative

from Psychological Services, and a representative from the Education Department. The Job Counselor shall be a non-voting member of the Reclassification Committee.

In the Honor Dormitory, job transfers will be made by the Honor Dormitory Reclassification Committee. This Committee shall be composed of the Administrative Assistant to the Superintendent, the Inmate Personnel Officer, a representative from Psychological Services, and a representative from Social Services. The Job Counselor shall be a non-voting member of the Reclassification Committee.

3. These committees shall report directly to the Managing Officer. The function of the Job Assignment Committees will be to make all initial assignments and reassignments in the Honor Dormitory and the stockade.

## II. INITIAL ASSIGNMENTS

1. The Classification and Honor Dormitory Placement Committees will make initial assignments of inmates to individual jobs in Shops rather than to the Shops for individual assignment by Job Supervisors. These decisions will be made on the basis of information from the Job Description Book and with the advice of the Job Counselor, whose duty it will be to keep these committees informed of the content of all jobs in the prison and what jobs are available for initial assignment to inmates. An inmate need not be assigned to a specific job if such inmate is selected for an education program.

2. During the inmate orientation period and prior to an inmate's initial assignment in the Stockade, the Job Counselor shall meet with the inmate and be responsible for explaining to him the content of individual jobs and the job assignment system. The Job Counselor shall also obtain the abilities, qualifications and job goals of every incoming inmate. The Job Counselor shall have the authority to gain access to all available information on an inmate including that developed by CMRC. The Job Counselor will keep a record of all interviews with incoming inmates.

3. The Classification Committee and the Honor Dormitory Placement Committee shall keep records of all decisions as to initial job assignments, including votes as to the assignment of inmates, if such are necessary. There records will be kept in the office of the Job Counselor.

4. Once an inmate is assigned to an initial job, the Job Supervisor shall report to the Committee which assigned him that the inmate has been received at his Shop and is working on the assigned job.

## III. INTRA–SHOP TRANSFERS

1. A Job Supervisor shall have the authority to fill a position within his shop or job category from one job to another but only on the basis of the procedure outlined in Provision III. However, this procedure shall not apply to the filling of any jobs in the Stockade which require honor or semi-honor status nor to any jobs in the Honor Dormitory designated as "high security" positions. All Stockade honor and semi-honor status jobs and all Honor Dormitory high security job vacancies shall be filled in accordance with the procedure outlined in Provision VII.

2. All job vacancies in a shop, other than "temporary vacancies" (as defined below) must be posted by the Job Supervisor in a central place in the Shop for at least three days on prepared forms readily available to all inmates in the Shop.

3. All inmates in the shop in which the vacancy has occurred shall be allowed to bid on the job by completing a written application prepared by the Job Counselor and submitting it to the Job Counselor or Job Supervisor.

4. After the three day posting period, the Job Supervisor shall have the authority to choose an inmate from the five inmates with most prison seniority (as defined below) who have bid on the job. If the Job Supervisor chooses an inmate from the top five inmates in prison seniority who have bid on the job, this decision of the Job Supervisor shall be posted for not less than the next five working days.

5. Copies of the original posting notice, all applications and the decision of the Job Supervisor shall be sent to the Job Counselor who will report the vacancy, bids and decision of the Job Supervisor to the Job Assignment Committees. In the stockade, all vacancies of entry level jobs shall be reported to the Classification and Reclassification Committees. Other vacancies shall be reported to the Reclassification Committee. In the Honor Dormitory all vacancies of entry level jobs shall be reported to the Honor Dormitory Placement and Honor Dormitory Reclassification Committees. Other vacancies in the Honor Dormitory shall be reported to the Honor Dormitory Reclassification Committee. The decision of the Job Supervisor shall become final if the Job Assignment Committees take no contrary action at their next regularly scheduled meeting or if the Managing Officer does not disapprove of the assignment due to security reasons. Prior to the meeting of the Job Assignment Committees, the Job Supervisor shall have the authority to fill the vacancy with the inmate whom the Job Supervisor has chosen from the top five inmate applicants in prison seniority.

6. If the Job Supervisor desires to choose an inmate from his shop to fill a permanent vacancy and such inmate is not among the top five applicants in prison seniority within his shop, the Job Supervisor must request this individual through the Job Counselor and receive the *prior* approval of the Reclassification Committee before the Supervisor can fill the vacancy. The Job Supervisor shall be required to present clear and convincing evidence to the Reclassification Committee as to why this individual is more suited for the vacancy than any of the top five inmate applicants in prison seniority, and heavy presumption shall exist in favor of the latter. The Reclassification Committee shall act upon the request of the Job Supervisor at its next regularly scheduled meeting. It shall review all of the records and qualifications of the top five senior applicants and the individual whom the Job Supervisor wishes to choose. The Job Assignment Committees shall have the authority to hear witnesses, including the Job Supervisor, the applicants and all other interested parties. It shall obtain the advice of the Job Counselor. The decision of the Job Assignment Committees shall be posted in the affected shop. All records pertaining to the decision shall be kept by the Job Counselor. During the time which it takes the Job Assignment Committees to make a final decision, the Job Supervisor may fill the permanent vacancy with anyone other than the top five senior applicants or the individual whom the Job Supervisor recommends, until the decision by the Job Assignment Committee is made.

7. "Prison seniority" or "seniority" as those terms are used in the assignment of inmates to jobs shall be defined in regard to inmates in the Stockade as the length of time spent at M.C.I. for the term of incarceration presently being served. In the case of parole violators, prison seniority will accrue from the date of incarceration at M.C.I. after an inmate's parole status has been revoked. In regard to inmates assigned to the Honor Dormitory, "prison seniority" or "seniority" shall be defined as the length of time spent at the Honor

 Dormitory at M.C.I. for the term of incarceration presently being served.

8. The Job Supervisor shall not have the authority to fill any position within his Shop by any inmate who works outside the authority of his Shop. The Job Supervisor shall make no inter-shop transfer of inmates.

9. Temporary vacancies shall be filled at the discretion of the Job Supervisor by any inmate within his Shop. A "temporary vacancy" shall be deemed to exist where an inmate presently holding a position is unable to perform his duties for not greater than twenty (20) calendar days due to such occurrences as furlough, an illness, the filling of another temporary vacancy, an emergency, or the like. Job Supervisors shall keep records of all temporary transfers. If a temporary vacancy should last for more than twenty (20) calendar days, the Job Supervisor shall notify the Job Counselor, who shall notify the Job Assignment Committees. The Job Assignment Committees then shall have the authority to determine whether or not the vacancy is temporary or permanent at its next regularly scheduled meeting. If the Job Assignment Committees determine that the vacancy is permanent, the vacancy shall be filled under the procedure outlined in Provision III or IV.

## IV. INTER–SHOP TRANSFERS

1. If a Job Supervisor is unable to or does not wish to fill a permanent vacancy from within his Shop, he shall immediately notify the Job Counselor. The Job Supervisor shall be prohibited from making any inter-shop transfers on his own or from requesting individuals from another shop or from making requests for individuals to the Reclassification Committee. All Inter-Shop transfers shall be made exclusively under this Provision IV except for the assignment of jobs requiring honor or semi-honor status in the Stockade and jobs designated as "high security" in the Honor Dormitory. These categories of jobs shall be filled in accordance with Provision VI.

2. Upon receipt of the notice, the Job Counselor shall post information concerning the vacancy on the next regularly scheduled working day in a central location or central locations which will inform all inmates of the opening. In addition, the information as to the opening should contain a detailed job description analysis or a reference to the Job Description Manual, which should be readily available to all inmates. This vacancy notice shall be posted for at least three working days. All inmates shall be allowed to apply for the position on written application forms readily available to them and submitted to the Job Counselor. The Reclassification Committee shall choose an inmate to fill the position from the top five (5) senior inmates in prison seniority who have applied, unless the job has been designated as a "skilled" job. If a job is designated as a Skilled position in the Job Description Manual, the Reclassification Committee shall have the authority to choose an individual from outside the top five senior applicants. However, in their records, the Reclassification Committee shall specifically state the basis for their decision as to why the job constitutes a Skilled position. In determining who shall fill a job, the Reclassification Committee shall review all records and qualifications of all applicants whom it is considering. It shall have the authority to hear witnesses. It shall obtain the advice of the Job Counselor. The decision of the Reclassification Committee as to who shall be assigned the job and the reasons therefore shall be posted in all designated central locations and a copy of such shall be sent to the affected Job Supervisor. All records shall be transmitted to and kept by the Job Counselor.

3. In regard to any Inter-Shop transfer, no Job Supervisor, on his own initiative, shall attempt to influence or interfere with a decision of the Job Assignment Committees, unless the Job Assignment Committees or the Job Counselor first seeks the opinion of the Job Supervisor.

4. If no inmates apply for the position and the vacancy is an entry level job, the Classification Committee or the Honor Dormitory Placement Committee shall fill the position with an inmate needing an initial assignment. If the job is not an entry level job, the information concerning the vacancy shall be reposted by the Job Counselor. If no one applies for the vacancy during the second posting period, the Reclassification Committee and the Honor Dormitory Reclassification Committee will have the authority to fill the position. The Job Counselor will advise these Committees in their selection process.

5. Once an inmate receives a new job assignment, that inmate will not be allowed to bid for a new job for a period of ninety (90) calendar days. This 90 day period shall not be extended. An inmate wishing to apply for a job before the end of his 90 day period must obtain the permission from the Job Counselor.

V. RACE

1. All shops employing four or more inmates and job categories employing four or more inmates within shops, as determined in the Job Description Manual, shall reflect the racial makeup of the prison population as nearly as possible within a twenty percent (20%) allowable deviation.

2. The Job Assignment Committees shall be responsible to see that these racial goals are accomplished and that no segregation on the basis of race exists in any job assignments. The Job Assignment Committees shall retain reports of the racial breakdown in shops and job categories for use in all of their deliberations.

3. The Job Assignment Committees shall receive reports of racial breakdown in shops and job categories on no less than a quarterly basis from all Job Supervisors. In regard to complaints of racial discrimination in job assignments or if the Job Assignment Committees find that a pattern of racial discrimination exists, they shall have the authority to hold hearings, review records, and make affirmative decisions to eliminate all vestiges of racial discrimination in shops or job assignments.

VI. SPECIAL ASSIGNMENTS

1. The Managing Officer shall give a list of all jobs which he designates as requiring honor or semi-honor status in the Stockade and as "high security" in the Honor Dormitory to the Job Assignment Committees and the Job Counselor.

2. Jobs in the stockade designated by the Managing Officer to require semi-honor status shall be posted in accordance with Provision IV. When the Reclassification Committee fills the position from the top five (5) senior inmates, the Committee shall report its decision to the Managing Officer who must approve the selection.

3. The Managing Officer shall have the authority to fill all job vacancies in the stockade which require honor status and all job vacancies in the Honor Dormitory which the Managing Officer designates as "high security" positions.

VII. OTHER PROVISIONS

1. Any job assignment decision or actions of a Job Supervisor in connection with a job assignment shall be subject to the Inmate Grievance Procedure.

2. The Reclassification Committee shall review annually every inmate who has worked in a particular shop for one year or more. The purpose of this review will be to obtain the reactions of the inmate on the particular

job and to determine if the job content has changed. Prior to the review, the Job Counselor shall notify the inmate of such and explain to him the purpose of the interview.

3. The Job Assignment Committees and the Job Counselor shall be responsible for classifying all new jobs and keeping current all job descriptions.

VIII. *SANCTIONS*

1. Any Job Supervisor who fails or refuses to follow these guidelines shall be subject to the following disciplinary measures:

 a. First Offense: Corrective counseling or a written reprimand which shall be placed in the Job Supervisor's personnel file.

 b. Second Offense: Not less than five (5) days suspension without pay.

 c. Third Offense: Removal.

2. The determination of whether or not a Job Supervisor has violated any of the provisions of these guidelines shall be made at a hearing of the Reclassification Committee. The Committee shall notify the Job Supervisor of the offense with which he has been charged. The Job Supervisor shall have the opportunity to appear before the Committee. The Committee shall hear witnesses and obtain all relevant evidence. The decision of the Reclassification Committee shall be forwarded to the Superintendent, who shall make the final determination.

APPENDIX F

M.C.I.—JOB COUNSELOR

1. The Job Counselor shall be a non-voting member of the Stockade Job Assignment Committee and the Honor Dormitory Job Assignment Committee. The Job Counselor shall report directly to the Managing Officer and shall have the primary responsibility to insure that all job supervisors, all inmates and the Job Assignment Committee are following the procedures of the M.C.I. Inmate Job Assignments.

2. The Job Counselor shall be responsible for keeping current the job content of all individual jobs and all vacancies which occur in prison jobs at M.C.I. It shall be the duty of the Job Counselor to keep the Job Assignment Committee properly informed of individual job content and vacancies. In this regard, the Job Counselor shall do the following:

 a. Review inmate job descriptions with job supervisor no less than semi-annually.

 b. Keep the Job Description Manual current and place copies of the Job Description Manual in places readily available to inmates and job supervisors.

 c. Keep job supervisors and inmates informed of job vacancies and individual job content.

3. The Job Counselor shall attend all meetings of the Job Assignment Committee and give advice to it in regard to all job assignments of inmates.

4. The Job Counselor shall meet individually with every inmate who enters M.C.I. during the orientation period and prior to an inmate's appearance before the Job Assignment Committee and receipt of an initial job assignment. The Job Counselor shall explain the job assignment system to such inmate. The Job Counselor shall also assess the abilities, qualifications and job goals of every incoming inmate. The Job Counselor will keep a record of all interviews with incoming inmates.

5. It shall be the duty of the Job Counselor to advise and discuss job assignments with inmates and job supervisors. In addition, the Job Counselor shall act as a liaison for job supervisors to the Job Assignment Committee in regard to any special problems of the job supervisors.

6. The Job Counselor shall post all notices of inter-shop vacancies and insure that job supervisors post all notices of intra-shop vacancies.

7. The Job Counselor shall keep all pertinent records as described in the M.C.I. Inmate Job Assignments procedure. This shall include all records regarding the racial composition of the prison population and the racial composition of shops and job categories within shops. The Job Counselor shall have no inmates working under his supervisor or on his staff.

## APPENDIX G

Entry

SHOP: Carpenter Shop
JOB: Porter
NUMBER OF EMPLOYEES: 2
DUTIES:

Primary: Sweep and mop entire shop area daily (after all machinery is shut down).
Empty all trash and scrap barrels daily.
Report any safety hazards to Supervisor.
Dust entire administrative area daily.
Safely stack and store shop materials in specific areas.
Clean and disinfect restroom daily.

Occasional: Assist in loading and unloading material or machinery.
Answer phone and take message.

QUALIFICATIONS: Must be able to work around machinery that can inflict serious physical damage.
Must be physically able to lift and stack materials around the carpenter's shop and also to dump scrap barrels.
Must be physically able to use commercial types of cleaners.

General

SHOP: Laundry
JOB: Extractor Operators and Pullers
NUMBER OF EMPLOYEES: 2
DUTIES:

Primary: Receive clothes from washer.
Put clothes in extractor (to remove water).
Pull clothes from extractor.
Put clothes in laundry carts and take to dryer men.

Occasional: Help load Honor Dorm trucks.

QUALIFICATIONS: Ability to learn how to load the extractor so that it is in balance while extracting.
Must be safety conscious in operating machine.
Must be strong enough to pull tangled clothes from extractor.
Must not be allergic to dust or lint.
Should be able to do moderate lifting (40 pounds waist high.

Skilled

| | |
|---|---|
| SHOP: | Infirmary |
| JOB: | Lab Man |
| NUMBER OF EMPLOYEES: | 2 |
| DUTIES: | |

Primary: Take blood samples, urine specimens, sputum collections.
Do CBC, FBS, U/A.
Plant cultures.
Be competent in smears and staining.
Use and maintain microscope and other lab equipment.
Keep equipment area clean and sanitary.
Collect milk samples.
Assist in emergencies within the lab or infirmary.

Occasional: May need to help in IV therapy.

QUALIFICATIONS: Previous experience or training in lab techniques.
Needs basic understanding of anatomy and physiology.
Ability to use and maintain microscope and other lab equipment.
Should be a high school graduate or have a G.E.D.
Must practice good personal hygiene.